# UNITED STATES DISTRICT COURT
# WESTERN DISTRICT OF KENTUCKY
# AT LOUISVILLE

**CAUDILL SEED AND WAREHOUSE COMPANY, INC.**　　　　　　　　　　**PLAINTIFF**

**vs.**　　　　　　　　　　　　　　　　　　　　　　**CIVIL ACTION NO. 3:13CV-82-CRS**

**JARROW FORMULAS, INC.**　　　　　　　　　　　　　　　　　**DEFENDANT**

## MEMORANDUM OPINION AND ORDER

This matter is before the court for consideration of two motions filed in this case – a motion by defendant Jarrow Formulas, Inc. for partial reconsideration of the court's September 29, 2017 memorandum opinion and order (DN 256), and a motion by Jarrow for sanctions for the purported failure of plaintiff Caudill Seed and Warehouse Company, Inc. to comply with the magistrate judge's discovery order (DN 259). We will address these motions *seriatim*.

In this action, Caudill Seed accuses Jarrow of violating the Kentucky Uniform Trade Secrets Act ("KUTSA"), KRS 365.880 *et seq*. Kentucky Revised Statutes 365.880(4) defines "trade secret" as "information, including a formula, pattern, compilation, program, data, device, method, technique, or process, that…[d]erives independent economic value, actual or potential, from not being generally known to, and not being readily ascertainable by proper means by, other persons who can obtain economic value from its disclosure or use, and [i]s the subject of efforts that are reasonable under the circumstances to maintain its secrecy." Of course, misappropriation of such information may be established through proof that it was acquired by a person [including a corporation] who knows or has reason to know that the information was acquired by improper

means (365.880(2)(a)), or by the use of the information by that person who, at the time of use, knew or had reason to know that his knowledge of the information was derived from or through another person who utilized improper means to acquire it or owed a duty to the party seeking relief to maintain the secrecy of the information (365.880(2)(b)(2)(a);(c)).

By way of background, we draw from our October 29, 2015 Memorandum Opinion addressing the parties cross-motions for summary judgment (DN 145). We relate various facts, some alleged, some undisputed, so that the court's rulings on the present motions can be appreciated in context.

Caudill Seed, a seed distribution company, produces and sells a broccoli seed extract which contains glucoraphanin, a nutritional supplement ingredient touted for various health benefits.[1] Glucoraphanin occurs naturally in broccoli seed. Caudill Seed developed its own process for extracting the glucloraphanin from the seed. Caudill Seed sold the broccoli seed extract to nutrition supplement producers such a Jarrow who used the extract in their nutritional products. At one time, Jarrow was Caudill Seed's largest purchaser of bulk broccoli seed extract.

Caudill Seed employed Kean Ashurst as a researcher and nutritional supplement formulator from 2002 to 2011. His work focused on broccoli-based supplements. Prior to 2011 when Ashurst left Caudill Seed and went to work for Jarrow as a consultant, Jarrow purchased Caudill's broccoli seed extract and used it in several of its nutritional supplements including its product, BroccoMax. Since hiring Ashurst, Jarrow has been manufacturing its own broccoli seed extract for use in BroccoMax and other products. In other words, Jarrow cut out the middle man, becoming its own broccoli seed extract manufacturer. Under the guiding hand of its new consultant, Ashurst, Jarrow developed and brought to commercial production an "activated" broccoli seed extract in a period

---

[1] Caudill Seed's numerous other business ventures are not pertinent here.

of four months. Ashurst possessed precise parameters of an "activated" formula in one to two months of beginning his work for Jarrow and began testing it.

Jarrow contends that it did nothing wrong in hiring Ashurst away from Caudill Seed and developing its own manufacturing processes for an "activated" broccoli seed extract, as it contends that the market was fair game and all of the necessary information existed in the public domain at that time. Caudill Seed, on the other hand, contends that Jarrow, a company that had no experience, personnel, equipment, or facilities associated with extraction processes, for broccoli seed or otherwise, could not have produced a commercial-scale glucoraphanin ingredient within a few months without having received the benefit of "years of research and development, the compilations of technical data, the trial and error work, and Caudill Seed's negative know-how developed through years of expense and effort, and distilled by Caudill Seed into a turn-key product.[2] It claims that the information which afforded it the ability to successfully manufacture and market its extract was kept secret and in-house, and that it provided Caudill Seed a competitive advantage in the market.

It is undisputed that Ashurst had access to all of Caudill Seed's research findings, processes, and broccoli supplement formulas. Indeed, his own efforts in the field yielded much of the research and development during his tenure there, and he jealously guarded the information. There is testimony that he recorded the information in a laboratory notebook and stored information on an external hard drive which he kept locked in his office or laboratory, or kept with him.

---

[2] Caudill Seed's response to Interrogatory No. 1 requesting that Caudill Seed "[d]escribe in detail the Alleged Confidential Information that Ashurst allegedly provided to [Jarrow]…" Within this response, Caudill Seed more specifically delineated six categories of alleged trade secrets that it claims Jarrow misappropriated. *See* DN 259-2.

3

Caudill Seed had been experimenting with "activated" formulas for glucoraphanin for at least three years before Ashurst left Caudill Seed. Apparently the motivation to produce an "activated" formula was in response to indications from a number of scientific publications that the existing glucorapahin-based products did not effectively release in the human body. The "activated" formula focused on preservation and utilization of the enzyme, myrosinase, which is claimed to metabolize glucoraphanin in the body. Ashurst informed Caudill Seed that it had an "activated" product nearly ready for commercial production. It was at this point, in May 2011, that Ashurst left the company and went to Jarrow.

There is some evidence that Ashurst was planning to leave Caudill Seed as early as 2010. There is testimony from both Ashurst and Jarrow Rogovin, the owner of Jarrow, that Jarrow was trying to "beat [Caudill Seed] to the punch" in producing an "activated" broccoli seed extract despite never having never before been such a producer. So Rogovin hired Ashurst to consult and turn Jarrow into a manufacturer of an "activated" broccoli seed ingredient, because, as in the words of Rogovin, "it takes a farmer to farm," and he was not a farmer. (DN 133-21, PageID #7085).

Ashurst admits that in April 2011 Dallas Clouatre, a scientific consultant for Jarrow, asked for, and Ashurst provided, Caudill Seed's research file on its broccoli seed extract and "broccoli actives." He admits to providing Jarrow a provisional patent application for Caudill Seed manufacturing processes which was not made public until 2012, as well as customer lists, summaries of product development plans and production costs. While there is apparently no dispute that the hard drive and notebook previously mentioned contained Caudill Seed research and development information, Ashurst denies having taken the notebook. The notebook was allegedly seen by Caudill Seed personnel immediately before his resignation and never thereafter.

4

Ashurst did admit to taking the hard drive which he claims to have later returned. There is a dispute as to what was contained on the hard drive. There is evidence that the specific details of the Caudill Seed process which Ashurst had previously provided to FONA, Caudill Seed's manufacturing vendor, which Caudill Seed was able to retrieve, contained "very well-defined steps which talk about temperatures, quantities of material, volumes of extracting material. There was even reference to specific types of equipment that one would use. It was set up very much as a procedure to be followed…almost like a cookbook, if you will." (DN 133-61, PageID #7502-7503). These observations were made by Dr. Leslie West, Jarrow's expert who also opined that (1) the process for producing deoiled broccoli seed powder by supercritical fluid extraction using carbon dioxide as a solvent, (2) the process for water extraction of myrosinase from broccoli and spray drying the extract to obtain myrosinase powder, (3) the concept of formulating nutritional supplements containing glucoraphanin, myrosinase, and ascorbic acid to catalyze the reaction between myrosinase and glucoraphanin, and (4) the process for producing sulforaphane from glucoraphanin using myrosinase were known or readily ascertainable by proper means based on information in the public domain.

Jarrow began commercial production of an "activated" ingredient in September 2011, four months from the time it hired Ashurst. There is evidence that as early as June or July of 2011, Ashurst provided Valensa, an extraction facility, with all of the parameters for a supercritical fluid extraction, including time, temperature, pressure, unit volume, and preparation. There is testimony from an individual at Valensa that Ashurst was prepared with these precise parameters for testing on his first call to the facility. (DN 133-8, PageID #6955). Ashurst described his own actions in consulting for Jarrow as providing "the road map for producing…a glucoraphanin product." (DN 133-1, PageID #6835).

5

Rogovin acknowledged that it created its own broccoli seed extract using Ashurst's knowledge and experience and building on it. (DN 126-11, PageID #5754). Rogovin contends that Caudill Seed's processes were unnecessary to Jarrow's work and it did not rely on them. He stated that Caudill Seed's process for achieving "activated" glucoraphanin was unsuccessful and was abandoned by Ashurst for another unique process for producing an "activated" glucoraphanin ingredient for which Jarrow subsequently obtained a patent.

I.

Caudill Seed filed a provisional patent application for the general manufacturing process for spray-dried myrosinase. That application was rejected. Its appeal of the final rejection was affirmed by the Patent Trial & Appeal Board ("PTAB") on February 2, 2017. Jarrow sought leave to file a motion for partial summary judgment, urging that the PTAB decision precluded as a matter of law any finding that the general manufacturing process set out in the provisional patent application is a trade secret. This motion was denied. (DN 251, PageID #15006-15007). Jarrow seeks to revisit our ruling, contending that no trade secret use may be found because various aspects of Caudill Seed's product and process described in the application were found to be in the public domain.

Citing *Stratienko v. Cordis Corp*, 429 F.3d 592 (6th Cir. 2005), Jarrow urges that the PTAB decision establishes that there are no "innovative" features in Caudill Seed's processes. It contends that a circumstantial inference of trade secret use is impermissible because, in light of the PTAB findings, Caudill Seed cannot show that any of its processes was innovative. (DN 256-1, PageID #15049).

6

We note that the evaluation of the sufficiency of evidence to permit a circumstantial inference of trade secret use is necessarily fact dependent. We do not find *Stratienko* to be comparable on the facts. In *Stratienko,* the manager of business development and in-house counsel, the individuals who had hands on Dr. Stratienko's design, denied sharing the information with anyone else at Cordis. In attempting to establish a genuine issue of material fact, the plaintiff sought to show use by Cordis by circumstantial inference. To be entitled to such an inference, the plaintiff must show come forward with evidence of access to the design and a sufficient relevant similarity between the design and the and the defendant's product. The court addressed the element of similarity, finding that Stratienko's evidence "fail[ed] to identify which, if any, *innovative* features his and Cordis' designs share." *Id*. at 600 (emphasis in original).[3]

In this case, however, we have direct evidence of Jarrow's access to Caudill Seed's confidential information contained in the provisional patent application. Ashurst admits to providing the unpublished application to Jarrow. Caudill Seed claims a trade secret in the general manufacturing process set forth in the provisional patent application which admittedly was not published until August 23, 2012. The general process Caudill Seed used to produce its broccoli seed extract remained confidential until the provisional application was published, but Ashurst nonetheless provided the provisional patent application to Jarrow. Ashurst stated that he provided "the road map for producing…a glucoraphanin product," and Rogovin stated that Jarrow created its own broccoli seed extract using Ashurst's knowledge and building upon it. The fact that Ashurst had Jarrow up and running as a broccoli seed extract manufacturer and had developed a

---

[3] The court used the term "innovative" without citation to other authority. This court surmises from the context of the case that the term was not used as one of art requiring novelty, but was used by the court simply to indicate that it was looking to identify something from the plaintiff's design in the defendant's device to indicate that, more likely than not, the design of the plaintiff was used in creating the defendant's device.

commercial grade glucoraphanin ingredient within four months is posited by Caudill Seed as circumstantial evidence of Jarrow's use of its confidential information, all six categories of it, including the provisional patent application, which mapped the way for Jarrow's otherwise impossibly swift achievement. It is Jarrow's contention that none of Caudill Seed's information constitutes a trade secret. Jarrow claims that it didn't need Caudill Seed's information and rejected it, but that any use of any of such information was not improper because the information was not protectable as a trade secret because it was all in the public domain.

Upon consideration of this issue yet again, we remain convinced that there is a genuine issue of material fact whether Caudill Seed had trade secrets, whether Jarrow misappropriated those trade secrets, and whether Caudill Seed was injured thereby. We reiterate that "[i]t is no defense in an action of this kind that the process in question could have been developed independently, without resort to information gleaned from the confidential relationship…'Even if resort to the patterns of the plaintiff was more of a convenience than a necessity, still, if there was a secret, it belonged to him, and the defendant had no right to obtain it by unfair means, or to use it after it was thus obtained.' Although the court went on to say that anyone is at liberty to discover the secret and use it thereafter with impunity, that fact does not excuse the obtaining of a secret by improper means or the inequitable use of the same." *Imperial Chemical Industries Limited v. National Distillers & Chemical Corporation*, 342 F.2d 737, 743 (2d Cir. 1965). *See also Mike's Train House, Inc. v. Lionel, L.L.C.*, 472 F.3d 398, 410-11 (6th Cir. 2006) which held "A trade secret can exist in a combination of characteristics and components, each of which, by itself, is in the public domain, but the unified process, design and operation of which, in unique combination, affords a competitive advantage and is a protectable secret." The PTAB finding thus evidences that various aspects of Caudill Seed's general process were in the public domain, but Caudill Seed

is not precluded from establishing, if it can, that its unified process or combination of elements as revealed in the provisional patent application was unique and afforded it a competitive advantage in the market.

We note also that, despite citing to the Tennessee Uniform Trade Secrets Act, *Stratienko* relies on a number of Tennessee cases which were handed down pre-statute. The cases, addressing Tennessee common law claims for misappropriation of trade secrets, required a finding of use to establish misappropriation. Therefore, insufficient evidence to warrant a circumstantial inference of trade secret use was fatal to the claim. As stated in *GCA Services Group, Inc. v. ParCou, LLC*, No. 2:16CV-02251-SHL-cgc, 2017 WL 5496564, *12-13 (W.D.Tenn. Oct. 3, 2017),

> Plaintiff is correct—"proving misappropriation [under TUTSA] requires only evidence of acquisition by improper means." *William-Sonoma Direct, inc. v. Arhaus, LLC*, 109 F.Supp.3d 1009, 1018 (W.D.Tenn. 2015). By its very terms, "misappropriation" means "acquisition…<u>or</u>..use." T.C.A. § 47-25-1702(2)(A)-(B)…Defendants' reliance on *Stratienko v. Cordis Corp.,* 429 F.3d 592, 600 (6th Cir. 2005), which sets out the elements of "misappropriation of a trade secret under Tennessee common law – not the TUTSA," *William Sonoma*, 109 F.Supp.3d at 1018, is misplaced. In that case, the common law elements of misappropriation were relevant because the alleged misappropriation had occurred prior to TUTSA's July 2000 effective date. *Id*. at 596. Significantly, the threshold for proving misappropriation under TUTSA is much lower than under the common law.

We have found the same to be true with the KUTSA. *Luvata Electrofin, Inc. v. Metal Processing Intern., L.P.,* No. 3:11-CV-00398, 2012 WL 3961226 (Sept. 10, 2012)("In short, while allegations of actual use of a trade secret without proper consent would be sufficient to state a claim, allegations of actual use are not strictly required to state a claim, *quoting Fastenal Co. v. Crawford*, 609 F.Supp.2d 650, 672 (E.D.Ky. 2009); *Kendall Holdings, Ltd. v. Eden Cryogenics, LLC*, 521 Fed.Appx. 453, 460, n. 6 (6th Cir. 2013)("See Restatement (Third) of Unfair Competition § 40 cmt.

9

B (1995)(explaining that UTSA imposes liability not just for the wrongful use or disclosure of a trade secret, as case law often recites, but also for its acquisition by improper means).[4]

The motion of Jarrow Formulas, Inc. for partial reconsideration of the court's prior ruling (DN 256) is **DENIED.**

II.

A.

As previously noted, a "trade secret" is defined by KUTSA as "information, including a formula, pattern, compilation, program, data, device, method, technique, or process, that derives independent economic value, actual or potential, from not being generally known to, and not being readily ascertainable by proper means by other persons who can obtain economic value from its disclosure or use, and is the subject of efforts that are reasonable under the circumstances to maintain its secrecy."

As cited in the summary judgment opinion, in a number of trade secret cases, economic value has been recognized and trade secret protection afforded to information consisting of a process derived from years of trial and error research rather than a finished product. In the words of the court in *Norbrook Laboratories Ltd. V. G.C. Hanford Mfg. Co.*, 297 F.Supp.2d 463, 485 (N.D.N.Y. 2003, the sum of the work "serve[d] as a guide charting the way through the many problems and decisions faced in designing…and developing [the particular technology [citation

---

[4] *Smart & Associates, LLC v. Independent Liquor (NZ) Ltd.*, 226 F.Supp.3d 828, 856 (6th Cir. 2016) does not state a contrary principle. The court correctly opined in *Smart* that "mere possession" of an otherwise protected trade secret without any use does not constitute misappropriation within the meaning of the UTSA., citing *VanWinkle v. HM Ins. Grp. Inc.,* 72 F.Supp.3d 723, 736-37 (E.D.Ky. 2014). In *VanWinkle*, the defendant had been instructed to "clean out" her office and she had done so, removing a number of boxes of confidential documents which she had stored in her garage. Such "mere possession" alone could not establish misappropriation.


omitted]." *Id.* at 485. Quoting *Imperial Chem. Indus. Ltd. v. Nat'l Distillers and Chem. Corp.*, 342 F.2d 737, 743 (2d Cir. 1965), the court stated "Although the components of the [manufacturing process] are available in [literature available to the public], development of the know-how…to operate a commercial process using such a [component] based upon information in the public domain would have required vast research, at great expense in money and time, plus considerable trial and error over an extended period of time. [I]t was obviously [defendant]'s purpose to avoid the difficulties and the time and expense that would be required to arrive at a commercially feasible process from a synthesis of the information disclosed in the literature." *Norbrook Labs*, 279 F.Supp.2d at 485. *See also, Sit-Up Ltd. v. IAC/InterActive Corp.*, No. 05 Civ. 9292 (DLC), 2008 WL 463884 (S.D.N.Y. Feb. 20, 2018)(recognizing a class of cases "seeking protection solely for plaintiff's unique manner of combining certain pieces of public information into a commercially advantageous business model" contrasted with individually identified alleged trade secrets which were *not* represented as a business method where certain elements are uniquely strung together. In cases of compilation trade secret protection, the plaintiff should not be required to show that some constituent element of the business method or model was itself a trade secret); *Monovis, Inc. v. Aquino*, 905 F.Supp. 1205, 1231)("The circumstances of ATC's speedy coming of age in the single-screw compressor marketplace weigh decidedly in favor of the inference that they misappropriated the plaintiffs' trade secrets."); *Uncle B's Bakery, Inc. v. O'Rourke*, 920 F.Supp. 1405 (N.D.Iowa 1996)("information kept secret that would be useful to a competitor and require cost, time and effort to duplicate is of economic value."); *Bourns v. Raychem Corp.*, 331 F.3d 704 (9th Cir. 2003); *Bond v. PolyCycle, Inc.*, 127 Md.App. 365 (1999); *Mangren Research and Development Corp. v. National Chemical Company, Inc.*, 87 F.3d 937, 944 (7th Cir. 1996)("the user of another's trade secret is liable even if he uses it with modifications or improvements upon

11

it effected by his own efforts, so long as the substance of the process used by the actor is derived from the other's secret…[I]f trade secret law were not flexible enough to encompass modified or even new products that are substantially derived from the trade secret of another, the protections that law provides would be hollow indeed.").

The court addresses Jarrow's motion for sanctions against the backdrop of unusual facts in this case and relevant caselaw. It is rare indeed to have a former employee admit to taking his employer's confidential materials and for a former customer, now competitor, to admit to receiving them. It is also rare to find a company that entrusted a sole employee with the maintenance and control of confidential scientific information critical to its ability to continue manufacturing its product.[5]

Alleging that its trade secrets were misappropriated, Caudill now apparently finds itself unable to offer much particularity with respect to the allegedly purloined information. As Rogovin indicated, "farmers farm," and he needed Ashurst to produce broccoli seed extract. So too at Caudill Seed. The broccoli seed extract experimentation, development, and production was Ashurst's bailiwick. No other individual there had the level of skill and knowledge possessed by Ashurst nor access to the wealth of confidential scientific information which he maintained.

Caudill Seed was ordered to provide specifics if it has them, of formulas, processes, compounds and the like, vendors, customers, and prices contained in the information allegedly provided by Ashurst to Jarrow, and to further specify what was on the hard drive and in the notebook, if it knows. Caudill Seed's December 22, 2017 supplemental response indicates clearly

---

[5] There was testimony that when Ashurst left and the hard drive and notebook could not be found, Caudill Seed was thrown into a tailspin, and was forced to reverse-engineer its own product by obtaining information from its vendors that had been supplied to them for manufacturing processes by Ashurst. It purportedly took nine months to recover from the debacle.

12

that it has no further specific information to add to its Supplemental Response to Interrogatory No. 1. It was ordered to supplement its response requesting that it identify all individuals and entities to whom disclosure of trade secrets was made. It supplemented its Supplemental Response to Interrogatory No. 2 by identifying a number of additional entities. In response to the order to provide any additional responsive documents, it produced an additional fifteen pages that it obtained from its overseas vendor, NATECO2. We are satisfied that the order compelling these responses yielded all that there is to obtain with respect to Caudill Seed's purported trade secrets. Thus there will be no rabbits coming out of hats at trial, as Caudill has described with as much specificity as it could the confidential information allegedly provided by Ashurst to Caudill.

Whether Caudill Seed has enough information to prove its misappropriation claim at trial remains to be seen. However, in light of the extensive development of the issues in the case by both parties, and the fact that Ashurst himself created many of the documents he allegedly provided to Jarrow, the court would be hard pressed to find that Jarrow could not meet the evidence against it, as the alleged trade secrets are presently described. Any issues regarding proof which may be alleged to fall outside the scope of discovery provided by Caudill Seed can be resolved if and when they arise at trial. The court cannot resolve such conundrums in advance and in the abstract.

Further, we note that the majority of courts that have assessed whether trade secrets were sufficiently identified took that question up after hearing evidence at trial or a hearing addressing injunctive relief. After trial, the court is in the best position to evaluate the sufficiency of the plaintiff's identification of its trade secrets.

Therefore, the court finds that, with the exception of its supplemental responses to requests for admission Nos. 21 and 23, Caudill Seed has complied with the discovery order, and the motion for sanctions is **DENIED** to the extent it seeks to strike alleged trade secrets (1) and (3) – (6).

B.

With respect to Requests for Admission Nos. 21 and 23, the court concludes that Caudill Seed has failed to fully comply with the magistrate judge's order. Its December 22, 2017 supplemental response to Request for Admission No. 21 states:

> Subject to and without waiving the foregoing objections, Caudill Seed believes it has treated broccoli seed using supercritical fluid extraction with carbon dioxide at a pressure of 500 bar and a temperature of 185 for 2 ½ hours. However, Ashurst was in charge of research and development and is one of the few individuals who possess the requisite information. Caudill has timely requested the information from its vendors, and is currently waiting for a response to verify this information. Caudill will supplement its document production with all such non-privileged material received. In view of the foregoing, this Request is DENIED subject to continued review by Caudill in the course of this proceeding.

Caudill Seed's supplemental response to Request for Admission No. 23 is identical to No. 21 with the exception of the statement of the affirmative statement: "Caudill Seed believes it has combined (i) broccoli seed treated using supercritical fluid extraction with carbon dioxide at a pressure of 500 bar and a temperature of 185°F for 2 ½ hours with (ii) broccoli seed treated using supercritical fluid extraction with carbon dioxide at a pressure of 300 bar and a temperature of 140°F."

Caudill Seed indicated that, as of December 22, 2017, it was waiting for information from its vendors to verify the accuracy of its responses to these requests for admission. It is now September, 2018. Caudill Seed has not, to date, updated its responses. Caudill Seed has had enough time in the past nine months to verify its denials.

Therefore, **UNLESS CAUDILL SEED AND WAREHOUSE COMPANY, INC. UNEQUIVOCALLY ADMITS REQUESTS FOR ADMISSION NOS. 21 AND 23 WITHIN**

**FOURTEEN DAYS FROM THE DATE OF ENTRY OF THIS ORDER, THE REQUESTS FOR ADMISSIONS WILL BE DEEMED UNEQUIVOCALLY DENIED.**

**IT IS SO ORDERED.**