UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF KENTUCKY
AT LOUISVILLE

CAUDILL SEED AND WAREHOUSE COMPANY, INC.                    PLAINTIFF

vs.                                    CIVIL ACTION NO.  3:13-CV-82-CRS

JARROW FORMULAS, INC.                                    DEFENDANT

## MEMORANDUM OPINION AND ORDER

This matter is before the court on motion of the plaintiff, Caudill Seed and Warehouse Company, Inc. ("Caudill Seed"),  for an award of exemplary damages, prejudgment interest, attorney's fees, and for entry of final judgment. DNs 464, 564.

This action was tried to a jury over a 3 ½ week period and resulted in a verdict in favor of Caudill Seed, a damage award totaling $2,427,605.00, and a finding of willful and malicious misappropriation of trade secrets by the defendant, Jarrow Formulas, Inc. ("Jarrow Formulas") under the Kentucky Uniform Trade Secrets Act ("KUTSA"), KRS 365.880, *et seq*.  More particularly, the jury found that Caudill Seed possessed a trade secret with respect to research and development, the specific process for spray-drying myrosinase, vendor information, customer information, the laboratory notebook and hard drive.  The jury found misappropriation of research and development, the specific process for spray-drying myrosinase, vendor and customer information, but not the laboratory notebook and hard drive.  The jury awarded damages and found willful and malicious misappropriation only with respect to Caudill Seed's research and development.  The Court overruled Jarrow Formulas' motion for judgment as a matter of law challenging the verdicts and damage award. DNs 530, 531.

The Court is now asked to award exemplary damages pursuant to KRS 365.884 and attorneys' fees pursuant to KRS 365.886 and to enter final judgment in favor of Caudill Seed.


I. General Background

Caudill Seed is a 65-year-old family-owned business located in Louisville, Kentucky which produces and supplies agricultural products including seeds, sprouts, and the like to commercial producers and distributors.  It also sells ingredients for nutritional supplements, food and cosmetics, and sells some of its own nutritional supplements.

From 2002 until his resignation on May 2, 2011, Kean Ashurst ("Ashurst") was employed by Caudill Seed, holding a number of positions during that time.  Pertinent to this litigation was his employment as Director of Research at Caudill Seed, with the responsibility for research and development of new products and processes in the area of the extraction, isolation, and development of compounds from broccoli seed including glucoraphanin, the myrosinase enzyme, and the production of sulforaphane.  In that role, Ashurst had access to, worked with, and maintained as proprietary and confidential the body of research, data and information related to the development, production and marketing of broccoli seed extract and other related products.

Caudill Seed engaged in research and development related to seed and seed sprout production as well as processes for extracting, isolating and developing compounds from those products before, during, and after the period of Ashurst's employment with Caudill Seed. A significant body of research and development relating to seeds and seed extraction processes had been developed by Caudill Seed prior to Ashurst's arrival at Caudill Seed and was available to and utilized by Ashurst in his work for Caudill Seed.

During the years of his employment at Caudill Seed, Ashurst maintained crucial notes and formulas in stenographer's notebooks, a composition notebook (referred to herein as the "lab notebook"), and on an external computer hard drive. He carefully guarded these items as they were the principal repositories for his task lists, thought processes and research results in his work for Caudill Seed. He kept the laboratory in which he worked locked and generally inaccessible to anyone other than his staff. The steno pads were locked in a file cabinet and the lab notebook and hard drive were either kept with Ashurst or were locked in the laboratory. To Caudill Seed's great regret, it entrusted most of the memorialization of its science solely to Ashurst. Ashurst was also privy to information concerning Caudill Seed's vendors, customers, pricing structures, information essential to the successful and profitable production and sale of its products.

Broccoli extract proved to be valuable to Caudill Seed. Due to its high concentration of glucoraphanin, the consumption of which is thought to have positive health effects in humans, it was sought after by nutritional supplement manufacturers, and specifically Jarrow Formulas. Preceding his departure from Caudill Seed, Ashurst was working to develop a process to produce a glucoraphanin product that offered better release of sulforaphane, the beneficial compound yielded in the human body from the ingestion of glucoraphanin-rich material. The ability to produce a higher sulforaphane yield has been referred to in this litigation as an "activated formula." Prior to Ashurst's resignation, Caudill Seed was preparing for commercial production of an activated formula broccoli extract product.

Jarrow Formulas was formerly a customer of Caudill Seed that purchased bulk quantities of Broccoraphanin, Caudill Seed's broccoli extract powder which Jarrow Formulas used in formulating its BroccoMax and other nutritional supplement products. Caudill Seed marketed its own broccoli extract nutritional supplement, Vitalica, and so competed with Jarrow Formulas in

3

this aspect of its business.  Jarrow Formulas was Caudill Seed's largest bulk purchaser of Broccoraphanin until Jarrow Formulas decided to cut out the middleman and become a broccoli extract manufacturer in 2011.

Jarrow Formulas had never before engaged in research and development or manufacturing of broccoli extract and in 2011 it had no scientists on staff capable of doing it. Jarrow Formulas was interested in producing an activated formula of its BroccoMax and other products.  To that end, and in order to itself become a manufacturer of broccoli extract, it hired Ashurst away from Caudill Seed.  The process of negotiation and transition began before Ashurst left Caudill Seed. Ashurst signed a consulting agreement with Jarrow Formulas the day before his resignation.  When he left, the lab notebook and external hard drive containing Caudill Seed's critical formulas and research data disappeared.  With its Director of Research gone and its laboratory in disarray, Caudill Seed was forced to essentially reverse engineer its own processes with the assistance of the testing facilities with which it worked.  It took many months to get its house back in order, not in insignificant part due to the fact that it had permitted Ashurst to maintain and control all of its most critical information.   Caudill Seed also discovered that Ashurst provided numerous documents containing Caudill Seed's confidential and proprietary information in response to requests from Jarrow Formulas employees and agents.  Ashurst acknowledged providing Caudill Seed documents  to Jarrow Formulas.

Despite having no research and development of its own or any experience in the area of broccoli extract production, Jarrow Formulas created a successful manufacturing process and began producing a profitable activated formula mere months after hiring Ashurst as its consultant. Ashurst admitted that it was Jarrow Formulas' intention to "beat Caudill Seed to the punch" in bringing to market an activated formula broccoli extract product.  Jarrow Formulas admitted and

4

it was further proven at trial that Ashurst provided numerous confidential and proprietary Caudill Seed documents to Jarrow Formulas at Jarrow Formulas' request. Jarrow Formulas accomplished its goal of becoming a broccoli seed extract manufacturer and bringing an activated formula broccoli product to commercial production in four months' time.  It subsequently succeeded in patenting its process for producing its activated formula.

## II. The Jury Verdict

The jury found that Caudill Seed possessed certain trade secrets, that Jarrow Formulas misappropriated some of those trade secrets, that Jarrow Formulas acted willfully and maliciously, and awarded $2,427,605.00 for Caudill Seed's actual loss and Jarrow Formulas' unjust enrichment.  The only trade secret for which the jury awarded damages and found willful misappropriation was Trade Secret 1 which was described for the jury as Caudill Seed's research and development related to dietary supplements, broccoli plant material (including seeds and sprouts), and the many years of trial and error research and compilation and analysis of data and technical information related to: (a) the chemical compounds at issue in this case, including glucoraphanin (also known as sulforaphane glucosinolate), myrosinase and sulforaphane; (b) the concentration, isolation and testing of those chemical compounds in broccoli plant material (including seeds and sprouts); (c) the extraction of those chemical compounds from broccoli plant material; and (d) the viable and nonviable processes for producing nutritional supplements, ingredients or other consumer goods derived from broccoli plant material and containing those chemical compounds. Caudill Seed is claiming trade secret protection for its entire body of knowledge developed over the course of many years.  DN 432, Jury Instructions, p. 5.

### III. Preliminary Matters

#### A.  The Connecticut Action

As noted in our earlier Memorandum Opinion, the Court is aware of a lawsuit filed in Connecticut against Jarrow Formulas seeking redress for Jarrow Formulas' alleged failure to pay its legal bills from its trial counsel's representation in this case.   Jarrow Formulas has counterclaimed against its former counsel that they failed to adequately defend Jarrow Formulas' interests in the misappropriation action.

Counsel make repeated references to filings in the Connecticut action, seeking to bolster their respective positions concerning exemplary damages and attorneys' fees matters under consideration here. This Court has not considered or relied upon representations concerning (1) Jarrow Formulas' former counsel's performance, (2) their relationship with or characterization of Jarrow Rogovin, the Founder and Chairman of the Board of directors of Jarrow Formulas, and (3) the attorneys' fees sought by Jarrow Formulas' former counsel for work performed in this case, as these matters are irrelevant to the issues presently before the Court.

#### B.  Evidence Outside the Record

Caudill Seed provided evidence at trial of (1) specific times, temperatures, and pressures used in its process, (2) testing data, (3) discoveries concerning viable and non-viable processes, (4) a compilation of relevant scientific literature, and (5) its vendor, cost, and customer information the synthesis of which constituted Caudill Seed's "seed to shelf" process for producing glucoraphanin and activated glucoraphanin as well as finished products Vitalica and Vitalica+.  Jarrow Formulas has unwaveringly asserted that the "body of knowledge" Caudill Seed claimed was misappropriated was no trade secret.  It supported this position at trial, in part, through the offer

6

of evidence that much of the information that Caudill Seed employed in its "seed to shelf" process was publicly available.  Jarrow Formulas now asks the Court to take judicial notice post-trial of ten journal articles and documents from published scientific studies which are purportedly "relevant to Caudill Seed's pending motion asking the Court to award significant exemplary damages against Jarrow Formulas and are not subject to reasonable dispute," to "show what information was in the public realm at the time of their publication."  DN 577, p. 1.

Federal courts take judicial notice of adjudicative facts. Fed. R. Evid. 201(a). The rule allows a federal court to "judicially notice a fact that is not subject to reasonable dispute because it: (1) is generally known within the trial court's territorial jurisdiction; or (2) can be accurately and readily determined from sources whose accuracy cannot reasonably be questioned." Fed. R. Evid. 201(b). The rule permits a federal court to take such notice "at any stage of the proceeding." Fed. R. Evid. 201(d).

The decision whether to take judicial notice under Rule 201 is a discretionary determination.  The denial of such a request will not be overturned for an abuse of that discretion where the offer of evidence does not properly fall within the bounds of the rule.  In *Deal v. Hamilton County Bd. of Education*, 392 F.3d 840, 852-853 (6th Cir. 2004) the United States Court of Appeals for the Sixth Circuit affirmed the district court's denial of a request that it take judicial notice of a number of declarations that had been filed in an unrelated case stating that "[T]here is no dispute that the California proceedings occurred or that the declarations in that case existed. The Deals, however, essentially were attempting to get the district court to take judicial notice of Dr. Rostetter's lack of credibility [through the offer of differing declarations made in another case], a fact very much in dispute."  In affirming, the Sixth Circuit quoted *United States v. Bonds*, 12

F.3d 540, 553 (6th Cir. 1993) in which the district court had declined to take judicial notice of a

National Research Committee report:

> While defendants' request that we merely take judicial notice of this report pursuant
> to Federal Rules of Evidence 201(f) and 104(a) has a certain facial appeal, Federal
> Rule 201 permits a court to take judicial notice only of facts "not subject to
> reasonable dispute…" Fed.R.Evid. 201(b).  There is no dispute that the [report]
> exists, but there is considerable dispute over the significance of its contents.

Jarrow Formulas' motion does not attempt to explain why the Court should take judicial

notice of ten publications which were not offered at trial.  Maybe that is because it acknowledges

that "the purpose of this provision is not to provide an escape hatch for counsel's errors or to offer

a strategic mechanism for a defendant to re-open the record after the jury begins to

deliberate…Judicial notice is a process by which a court takes recognition of a fact in the absence

of formal proof; it is not a mechanism by which a party may avoid timely and proper objections to

evidence that is reasonably available and, which, but for counsel's error, would be subject to

introduction and consideration through the normal evidentiary mode."  *United States v. Neill*, 964

F.Supp. 438, 445-46 (D.D.C. 1997).

Jarrow Formulas urges that, under the rule, the Court should take judicial notice because

"these items are relevant to Caudill Seed's pending motion asking to award significant exemplary

damages against Jarrow Formulas and are not subject to reasonable dispute. This Court may take

judicial notice of the articles to show what information was in the public realm at the time of their

publication." DN 577, p. 1. .  But taking judicial notice of the mere existence of these publications

affords nothing of value. It is only when note is taken of what these publications contain that they

might take on significance or relevance to the case.   We conclude, similarly to the Sixth Circuit

in *Bonds,* that while the existence of these articles is not subject to reasonable dispute, the

significance of their content would be vigorously disputed were the Court to recognize them in

this action through the mechanism of judicial notice. Thus, Jarrow Formulas' motion does not constitute an offer of adjudicative facts of which the Court may take judicial notice under Rule 201.  The proper avenue to offer these publications was at trial where their relevance and admissibility could have been tested and counsel would have had the opportunity to probe the information.

In looking at the arguments made in Jarrow Formulas' brief in opposition to the motion for exemplary damages (DN 578)[1], it is plain that these publications are indeed being offered for their content, not the mere fact of their publication.  Jarrow Formulas' urges that despite the jury verdict in Caudill Seed's favor, "the case was at least a close one on whether Caudill Seed would be able to identify a trade secret with sufficient specificity to support a jury verdict."  DN 578, p. 14. Jarrow Formulas postulates that

> *Even in light of the jury's findings*, Jarrow Formulas' clear confusion regarding the contours and validity of Caudill Seed's alleged trade secret, as corroborated by its repeated entreaties before and throughout the litigation, and the testimony of its expert witness, Dr. Leslie West, that the majority of the alleged trade secret was publicly known, must weigh in mitigation against an award of exemplary damages.

*Id.* (emphasis added).  Jarrow Formulas would have the Court judicially notice the ten publications *and consider them* along with the publications introduced at trial to conclude that it was a "close case."  The "close case" argument was essentially made in its motion for judgment as a matter of law.  Jarrow Formulas recounted its evidence in opposition to that which was adduced by Caudill Seed and urged the Court to find that Caudill Seed had not met its burden of

---

[1]Jarrow Formulas does not specifically refer to its brief in opposition to the motion for the award of exemplary damages and attorneys' fees, but its opposition refers to the motion seeking judicial notice.  Jarrow Formulas refers to the request for judicial notice at footnote 7 in its brief, suggesting that the Court consider both the evidence admitted at trial and the additional 10 articles sought to be added through judicial notice post-trial: "*In addition to the testimony at trial* showing various elements of Caudill Seed's 'seed-to-shelf' *compilation trade secret 1 was public knowledge, see also Request for Judicial Notice.*" (emphasis added).

persuasion despite the jury verdict.  For the reasons stated in our Memorandum Opinion addressing that motion, we rejected Jarrow Formulas' arguments.  The Court will not now expand the record post-trial by granting the motion to take judicial notice of outside evidence to bolster the contention that this was a "close case."

Jarrow Formulas urges the Court to consider the "alleged egregiousness of Jarrow Formulas' actions…in view of its good faith belief, at the time of the misappropriation and throughout the litigation, that Caudill Seed had not identified a valid trade secret" (DN 578, p. 12) and to refrain from awarding exemplary damages. Again, Jarrow Formulas urges that because it was a "close case," it acted under the good faith belief that its actions did not constitute misappropriation of trade secrets.  The jury necessarily rejected the idea that Jarrow Formulas was "confused" or that it held a good faith belief that it was not misappropriating Caudill Seed's trade secret when it found willful and malicious misappropriation, defined in the instructions as conduct that is "calculated, deliberate, and reprehensible."

The record amply reflects Jarrow Formulas' earnestness in its position throughout this litigation that it did nothing wrong.  At trial, Jarrow Formulas meticulously dissected and challenged each component of Caudill Seed's alleged trade secrets.  It has asserted from the inception of the case that Caudill Seed had nothing to misappropriate.  However, Caudill Seed persuaded the jury that Trade Secret 1 was indeed a trade secret under the KUTSA and that Jarrow Formulas willfully and maliciously misappropriated it.  The jury found so, notwithstanding the nature and amount of evidence offered by Jarrow Formulas that much of Caudill Seed's body of knowledge can be found in various places in the public realm.  Caudill Seed has never denied that fact.  The verdicts evidence that it was not a "close case" for the jury.  They believed from the evidence that Trade Secret 1 constituted a trade secret as defined by the jury instructions, Jarrow

10

Formulas' earnestness to the contrary notwithstanding.  Not only do the ten additional publications offered by Jarrow Formulas fail to satisfy Rule 201(b) and thus are not properly subject to judicial notice under 201(c), but the addition seeks to expand on a point already extensively argued on the record and upheld by the Court on Jarrow Formulas' motion to overturn the verdicts.

The motion for the Court to take judicial notice (DN 577) will be denied.

## C.  Sur-Reply and Sanctions

Jarrow Formulas filed a motion for leave to file a sur-reply to Caudill Seed's reply related to its request for an award of attorneys' fees (DN 585).  Caudill Seed has objected to the filing of a sur-reply and has moved for sanctions (DN 587) to "guarantee the integrity of the court and its proceedings" in response to the filing of a diatribe authored by Jarrow Rogovin which is attached as an exhibit to Jarrow Formulas' motion (DN 582-2).

Jarrow Formulas takes umbrage at materials culled from the Connecticut litigation which were offered by Caudill Seed in its reply in support of its request for attorneys' fees, including language from an email communication between Jarrow Rogovin and his former counsel.  Jarrow Formulas apparently considers the content of this email damning and worthy of the opportunity to be explained "in context."  The explanation comes in the form of an unbridled missive from the author of the email, Jarrow Rogovin.

The Court will again repeat that it is not concerned with any mud slung in the Connecticut litigation.  Criticism of Jarrow Formulas' former counsel's performance or of Mr. Rogovin's personal attributes are simply not in issue in this case.  None of it is considered here.  This is not a personality contest.  This is not a master class in litigation technique.  This is not a battle of the sur-replies to see who can get in the last word.  The issues before the Court at the present moment

involve *only* the Court's consideration of the nature of the misconduct by Jarrow Formulas, Inc., the company which was found liable by the jury for willfully and maliciously misappropriating Caudill Seed's Trade Secret 1, and an appropriate award of exemplary damages and attorneys' fees, if any, in this case.

The Court will, however, in its discretion, permit the filing of the sur-reply and Mr. Rogovin's declaration.  This piece of business litigation has been marked by strong personal overtones between the principals of the companies which have only deepened over time.  Mr. Rogovin's outrage at perceived injustices heaped upon him and the company he built finds clear voice in his declaration. He takes this litigation against his company as a personal affront and expresses his disdain for all that is or has become associated with this case.  The Court will provide Mr. Rogovin what he terms the "only and last opportunity for this Court to 'hear' from [him] prior to ruling on the pending motion and entering a final judgment."  DN 585-2, p. 3.  Despite the objections to it, the Court will permit it to stand in the record as written.

Mr. Rogovin's declaration offers a repetition of the defense of this case which was presented to and rejected by the jury and was considered and addressed thereafter on a motion for judgment as a matter of law.  Mr. Rogovin voices his continuing conviction that the jury reached the wrong result in finding Jarrow Formulas liable for willful and malicious misappropriation.

This Court read Mr. Rogovin's declaration, stripped of its vituperation, with an open mind in considering the factors pertinent to determining whether an award of exemplary damages against Jarrow Formulas is appropriate.  For the reasons explained below, the Court finds that exemplary damages are appropriate in this case.

In conjunction with its objection to the filing of the sur-reply, Caudill Seed seeks sanctions for the filing of the Rogovin Declaration because it contains offensive content.  Caudill Seed finds

12

comments critical of the Court and Caudill Seed's counsel particularly outrageous and seeks sanctions to redress these breaches of decorum.

Mr. Rogovin's criticisms of the Court's handling of this litigation are inconsequential.  In the words of Channing Pollock,[2] "A critic is a legless man who teaches running."  This matter is likely to be appealed and any reversible error will, no doubt, be brought to the attention of this Court by the United States Court of Appeals for the Sixth Circuit whose function it is to assess the correctness of rulings under the law and the sufficiency of evidence to uphold a jury verdict.  As for the assertion that the Court should address an affront to the dignity of this institution, the Court concludes, in its discretion, that the Rogovin Declaration should remain in the record of this case, uncensored and publicly available, left to speak for itself.

Finally, with respect to the request for sanctions, in this Court's view, Caudill Seed replied with unnecessary soundbites directed at the behavior and temperament of  Jarrow Rogovin in making their case for an award of attorneys' fees against Jarrow Formulas.  Thus, Rogovin's indignant retort should have come as no surprise.  Sanctions will be denied.


III.     Exemplary Damages:

A.  Willful and Malicious Misappropriation
[**DN 530, Part B, *reproduced***]

*The parties agreed to the language utilized in the Special Interrogatory defining the phrase "willful and malicious." The court instructed the jury as follows:*


*******

_____

[2] Channing Pollock, 1880-1946; drama critic for The Washington Post and Washington Times; writer, screenwriter, playwright, and musical theatre lyricist.

### *Special Interrogatory – Willful and Malicious Conduct*

*You will only consider this instruction if you found misappropriation of one or more trade secrets on Verdict Form B.*

*You must determine from the evidence whether Caudill Seed has proven by clear and convincing evidence that Jarrow Formulas misappropriated one or more of Caudill Seed's trade secrets in a willful and malicious way. "Willful and malicious" means behavior motivated by spite or ill will and a disregard for the rights of another with knowledge of probable injury. Put another way, "willful and malicious" conduct is calculated, deliberate, and reprehensible. Since the claims in this case are directed solely against Jarrow Formulas, the motivation which you must assess under this instruction is only that of officers, employees, or agents of Jarrow Formulas, other than Kean Ashurst.*

*\*\*\*\*\*\*\**

Jarrow Formulas contends that proof of actual malice is required under this instruction. It urges that there was no evidence that Jarrow Formulas was motivated by spite or ill will toward Caudill Seed or that it disregarded Caudill Seed's rights with knowledge of probable injury. Jarrow Formulas notes that spite and ill will are appropriate synonyms for malice. In addition to instructing that "willful and malicious" means behavior motivated by spite or ill will and a disregard for the rights of another with knowledge of probable injury, we also explained that "willful and malicious" conduct is calculated, deliberate, and reprehensible.

Under the KUTSA, "[i]f willful and malicious misappropriation exists," the court may award exemplary damages and a reasonable attorney's fee. KRS 365.884, 365.886. The KUTSA

14

*also states that "KRS 365.880 to 365.900 shall be applied and construed to effectuate its general purpose to make uniform the law with respect to the subject of KRS 365.880 to 365.900 among states enacting it."  KRS 365.894.  Thus, while the court is required to apply Kentucky law in this diversity action, Kentucky's trade secret act directs us to harmonize our interpretation of the provisions of the act, to the extent possible, with that of other states.*

*There is no Kentucky case which defines willful and malicious conduct in the context of trade secret misappropriation. Caudill Seed cites to Huddleston v. Hughes, 843 S.W.2d 90 (Ky.App. 1992) and Collins v. Rocky Knob Assoc., 911 S.W.2d 608, 611 (Ky.App. 1995) for guidance, urging that only willful disregard for the consequences of one's actions is required to support the verdict finding willful and malicious misappropriation.  Both Huddleston and Hughes involved the interpretation of a subsection of the Recreational Use Statute, KRS 411.190 which references "willful or malicious failure to guard or warn" against a dangerous condition, use, structure, or activity.  Notably, the statute refers to "willful" and "malicious" in the disjunctive. We instructed the jury in the conjunctive.*

*In Huddleston, the court looked to the Black's Law Dictionary definition of "willful" which includes "premeditated; malicious; done with evil intent, or with a bad motive or purpose, or with indifference to the natural consequences; unlawful; without legal justification."  Id. 1599 (6th ed. 1990).  In assessing the nuances between these terms, the court stated:*

> *Addressing punitive damages generally, the Supreme Court in Horton v. The Union Light, Heat & Power Co., Ky., 690 S.W.2d 382, 389 (1985), cites the Restatement (2d) of Torts § 908(2) (1979) and makes the following observation:*

> *"[E]vil motive" and "reckless indifference to the rights of others" are considered as synonymous. * * * [N]egligence when gross has the same character of outrage justifying punitive damages as does willful and malicious misconduct in torts where the injury is intentionally inflicted. Just as malice need not be expressed and may be implied from outrageous conduct, so too may wanton or reckless disregard for the lives and safety of others be implied from the nature of the misconduct.*

> *R.B. Tyler Co. v. Kinser, Ky., 346 S.W.2d 306, 308 (1961), holds that "malice is imputed where the wrongful act evidenced the entire want of care or great indifference to the consequences and the rights of others." Black's Law Dictionary 956–957, similarly, acknowledges that the term "malice" need not be used exclusively to characterize a deliberate intent to do harm:*

> *Malice in law is not necessarily personal hate or ill will, but it is that state of mind which is reckless of law and of the legal rights of the citizen.*

> *Black's defines a "willful and malicious injury" as follows:*

> *For such to exist there must be an intent to commit a wrong either through actual malice or from which malice will be implied. Such an injury does not necessarily involve hatred or ill will, as a state of mind, but arises from intentional wrong committed without just cause or excuse. * * * It may involve merely a willful disregard of what one knows to be his duty, an act which is against good morals and wrongful in and of itself, and which necessarily causes injury and is done intentionally.*

> *Id. at 1600 (Citation omitted) (Emphasis supplied).*

*Huddleston By & Through Lynch v. Hughes, 843 S.W.2d 901, 905–06 (Ky. Ct. App. 1992).*

*In Collins v. Rocky Knob Assocs., Inc., 911 S.W.2d 608 (Ky. Ct. App. 1995), the court cited to the Supreme Court of Kentucky's decision in Kirschner v. Louisville Gas & Electric Co., Ky., 743 S.W.2d 840 (1988), noting that "when discussing the duty owed by a landowner to trespassers under another statute, the court interpreted "willful" as applying to "conduct which is still, at essence, negligent, rather than actually intended to do harm, but which is so far from a proper state of mind that it is treated in many respects as if it were so intended...." Id. at 842–843. "[T]he actor has intentionally done an act of an unreasonable character in disregard of a known or obvious risk that was so great as to make it highly probable that harm would follow, and which thus is usually accompanied by a conscious indifference to the consequences...." Id. at 611.*

*The question of the appropriate application of the jury instruction is not clearly answered by these cases, as they did not address misappropriation of trade secrets which is by definition a*

16

*knowing and intentional act.  Willful and malicious misappropriation clearly requires something more, but how that translates into reprehensible behavior in the trade secret context is not made clear by the Kentucky cases alone. As we are instructed to harmonize our interpretation of the KUTSA, where possible, with the rulings of other courts, we look to decisions from other jurisdictions for guidance.  Although not binding on this court, we look to trade secret cases under other iterations of the UTSA and, to the extent consistent, pre-UTSA cases addressing this issue.*

*It is established that under Kentucky law, "malice" is not necessarily personal hatred or ill will, but rather may be found in a reckless indifference to the rights of others which is so egregious that malice is imputed. The act of misappropriation of trade secrets in itself can be an "[a]cquisition of a trade secret of another by a person who knows or has reason to know that the trade secret was acquired by improper means."  KRS 365.880(2)(a).  As this misappropriation requires knowledge of the wrongful procurement of the trade secret, the level of culpability required to justify an award of exemplary damages must necessarily be greater than a mere passive understanding of the wrongfulness of the activity and doing it anyway.  The Huddleston and Collins cases hint at this in referencing conduct "so far from a proper state of mind," an act which is "against good morals, and wrongful in and of itself and which necessarily causes injury and is done intentionally."  Collins, 911 S.W.2d at 611, Huddleston, 843 S.W.2d at 906.*

*Jarrow Formulas states that a mere motivation to compete for business does not rise to the level of malice.  This point was made in Mattel, Inc. v. MGA Entertainment, Inc., 801 F.Supp.2d 950 (C.D.Ca. 2011), an UTSA case. There the court stated: "Because parties do not ordinarily expect that misdeeds that cause purely economic loss may expose them to severe exemplary penalties, economic misconduct is not generally reprehensible enough to support a large award of exemplary damages.  See Gore, 517 U.S. 577, 116 S.Ct. 1589.  The exceptions, of course, are*

cases involving "affirmative acts of misconduct" marked not just by malice, but a breach of basic commercial ethics and fraud.  Id. So entrenched is society's expectation that exemplary damages are proper in such cases that statutes, including the UTSA, routinely provide for recovery of exemplary damages in cases involving financial loss and put the public on notice of the bounds of such relief."  Id.  at 954.  The court noted that Mattel's conduct "fell far short of basic ethical standards."  Its senior management had consistently encouraged employees to use false pretenses to acquire competitive information including price lists, advertising plans, and new product attributes.  It praised its employees for such actions and used trade secret information to preempt competitors' products. Ibid.

In E.I. DuPont de Nemours and Co. v. Kolon Industries, Inc., 911 F.Supp.2d 340 E.D.Va. 2012), also an UTSA case, the court explained that "maliciousness" under Virginia's iteration of the UTSA did not  invoke a "species of malice"  requiring an intent to injure.  Rather, the court instructed the jury that "[a]n act is done 'maliciously' if prompted or accompanied by such gross indifference to the rights of others as will amount to a willful act without just cause or excuse."  Id. at 343-44.

In the Sixth Circuit, the Court of Appeals, applying Ohio's general punitive damages statute in a trade secrets case, stated:

> Ohio statutory law provides that punitive or exemplary damages may not be recovered in a tort action unless both of the following apply:
>
> (1) The actions or omission of that defendant demonstrate malice, aggravated or egregious fraud, or insult, or that defendant as principal or master authorized, participated in, or ratified actions or omissions of an agent or servant so demonstrate.
> (2) The trier of fact has returned a verdict or made a determination ... of the total compensatory damages recoverable by the plaintiff from that defendant.
>
> Ohio Rev.Code Ann. § 2315.21(C)(1) & (2)(Anderson Supp.1996)…

18

> Ohio courts have allowed punitive damages to be awarded in trade secret cases "where the evidence shows that the defendant acted willfully and intentionally and with malicious intent." *Pyromatics v. Petruziello*, 7 Ohio App.3d 131, 454 N.E.2d 588, 595 (Ohio App.1983). In *Preston v. Murty*, 32 Ohio St.3d 334, 512 N.E.2d 1174 (Ohio 1987)(syllabus), the Ohio Supreme Court stated the law on punitive damages:

> We therefore hold that actual malice, necessary for an award of punitive damages, is (1) that state of mind under which a person's conduct is characterized by hatred, ill will or a spirit of revenge, or (2) a conscious disregard for the rights and safety of other persons that has a great probability of causing substantial harm.

> *Id.* at 1176 [emphasis ours]. Actual malice can rarely be proven "otherwise than by conduct and surrounding circumstances." *Villella v. Waikem Motors, Inc.*, 45 Ohio St.3d 36, 543 N.E.2d 464, 466-67 (1989), overruled on other grounds by, *Moskovitz v. Mount Sinai Med. Ctr.*, 69 Ohio St.3d 638, 635 N.E.2d 331, (Ohio 1994) "[A]ctual malice can be inferred from conduct and surrounding circumstances which may be characterized as reckless, wanton, willful or gross." *Id.* at 467.

*Macdermid Inc. v. Electrochemicals Inc.*, 142 F.3d 435, 1998 WL 165137 (6th Cir. March 31, 1998)(unpubl.). The *Macdermid* case, cited by Jarrow Formulas, supports a conclusion that actual malice may, under appropriate circumstances, be proven by such egregious conduct that ill will is inferred in a trade secret case.

The instruction given to the jury in this case includes the sentence that further amplifies the nature of the conduct which will rise to the level of willful and malicious misappropriation. "Willful and malicious" conduct "is calculated, deliberate, and reprehensible." That sentence is a derivation of language in *Sperry Rand Corp. v. A-T-O, Inc.* 447 F.2d 1387 4th Cir. 1971), a trade secrets case. The court in *Sperry Rand* affirmed the award of punitive damages against two former employees of Sperry Rand and their new employer, finding that the actions were "calculated, deliberate, and reprehensible" and that the individuals were both guilty of serious breaches of loyalty and responsibility to Sperry Rand, and that "the acts of the defendants were willful and deliberate and were committed with the knowledge that they were unlawful and were calculated

19

to result in substantial harm to the plaintiff." *Id.* at 1394. While *Sperry Rand* is a pre-UTSA case, its condemnation of breaches of loyalty and responsibility as reprehensible behavior has been cited in a number of decisions brought under the Virginia UTSA.[3]

Jarrow Formulas contends that there was no evidence offered that it was motivated by spite or ill will toward Caudill Seed or that it disregarded Caudill Seed's rights with knowledge of probable injury. We find that there was evidence adduced at trial from which a jury could reasonably conclude that Jarrow Formulas' misappropriation of Caudill Seed's Trade Secret 1 was willful and malicious. There was evidence from which a jury could reasonably find that Jarrow Formulas actively, deliberately, aggressively, and deceptively pursued Caudill Seed's trade secrets in order to "beat [Caudill Seed] to the punch" in getting an activated formula broccoli seed product to market. Secretive and underhanded tactics employed to capitalize on Caudill Seed's knowledge, designed to benefit Jarrow Formulas and necessarily to damage Caudill Seed as the flip side of that coin, could reasonably be found to constitute ill will. The evidence offered at trial established a two-way street for the exchange of information. Jarrow Formulas asked Ashurst to provide Caudill Seed's complete research file and agreed to compensate Ashurst for "delivering on the activated product." Jarrow Formulas contends that it was nothing more than healthy, honest competition, and that it had no interest in harming Caudill Seed. However, Jarrow Formulas was aware of Ashurst's confidentiality agreements with Caudill Seed, yet agreed to pay him to "deliver on the activated formula." Vol. 2B (Ashurst), 68:5-7.

Dubose's testimony concerning a "courtesy call" he received from Caudill Seed regarding the impending availability for purchase of Caudill Seed's activated formula despite the "abrupt

---

[3] *See American Sales Corp. v. Adventure Travel, Inc.,* 862 F.Supp. 1476 (E.D.Va. 1994)(exemplary damage award rejected under the VUTSA); *Nat'l Legal Research Group v. Lathan*, Civ. No. 92-0031-C, 1993 WL 169789 (W.D.Va. May 17, 1993)(exemplary damage award upheld under VUTSA).

departure" of Ashurst evidences the surreptitious nature of Jarrow Formulas' communications and activities with Ashurst such that Caudill Seed had no idea that it was about to be beaten to market by its own customer. Dubose, DN 412, pp. 24-30.  Similarly, Ashurst's secret trip from FONA to California, while still in the employ of Caudill Seed, to meet with Jarrow Formulas officials on the plan to bring an activated formula to market for  Jarrow Formulas and "beat Caudill Seed to the punch" reasonably suggests deception.  Dubose testified that Ashurst provided Jarrow Formulas the outline of steps in its process, admittedly not in the public domain, from Ashurst's "vast knowledge of years and years of experience." Id. at 24.  Caudill testified that Ashurst was hired as an equipment engineer, and that all of his broccoli extract-related knowledge came from Caudill Seed. Further, the fact that Jarrow Formulas was up and running as a manufacturer in four months speaks volumes in support of Caudill's Seed's contention that Jarrow Formulas acquired and used Caudill Seed's research and development, know-how and process in achieving this success at all costs.  A jury could reasonably conclude that Jarrow Formulas committed willful and malicious misappropriation in this case.

DN 530, Section IB, pp. 36-44.

We have reproduced Section IB of our opinion addressing the sufficiency of the evidence to support the verdict of willful and malicious misappropriation because Jarrow Formulas again argues its version of the facts in opposition to an award of exemplary damages.  Jarrow Formulas cites *Mattel, Inc. v. MGA Entertainment, Inc.,* 801 F.Supp.2d 950 (C.D.Cal. 2011) in which a California federal district court noted that the largest exemplary awards are reserved for the most reprehensible conduct[4], considering the nature of the misconduct including whether: (1) the misconduct caused physical harm; (2) the misconduct disregarded the health or safety of others;

---

[4] *citing State Farm Mut. Ins. Co. v. Campbell*, 538 U.S. 408, 419, 123 S.Ct. 1513, 155 L.Ed.2d 585 (2003).

(3) the misconduct targeted a financially vulnerable party; (4) the misconduct was repeated; and (5) the harm resulted from intentional malice, trickery, or deceit, or mere accident.  801 F.Supp.2d at 954.

Only one of the five factors identified by the court in *Mattel* is in play in this case -- whether the harm resulted from intentional malice, trickery, or deceit.  With respect to this factor, Jarrow Formulas urges that even if the actions delineated in our earlier decision sufficiently support an inference of willful and malicious conduct, they are not the type of intentionally reprehensible actions that merit a significant exemplary damages award.  Jarrow Formulas cites *Idenix Pharmaceuticals, LLC v. Gilead Sciences, Inc.,* 271 F.Supp.3d 694, 702 (D.Del. 2017) for the proposition that enhanced damages are not warranted in the absence of a "motivation for harm" because there must be something beyond a pure financial motive to distinguish a reprehensible case from a garden-variety infringement. Jarrow Formulas then re-argues its version of the facts but offers nothing new.  For example, its explanation that a secret trip from FONA to California to meet with Jarrow Formulas representatives while still in the employ of Caudill Seed would not be uncommon or its representation that obtaining Caudill Seed's vendor list was for purposes of making a "Do Not Call List" were rejected by the jury and thereafter by this Court. On this record, the Court finds a basis for an award of exemplary damages, as the Court sees elements of trickery and deceit in the conduct, as we have described.  This evidence speaks to conduct that goes beyond a pure financial motive and warrants imposition of some exemplary award.  As noted in *Mattern & Assoc., L.L.C. v. Seidel*, 678 F.Supp.2d 256, 272 (D.Del. 2010), "[I]t is axiomatic that exemplary damages provide a valuable function above and beyond compensatory damages in the punishment and deterrence of unlawful conduct.  *See BMW of N.Am., Inc. v. Gore*, 517 U.S. 559, 568, 116 S.Ct. 1589, 134 L.Ed.2d 809 (1996)."

B.  Amount of Award

The finding by the jury of willful and malicious misappropriation authorizes an award of exemplary damages, but the appropriate amount of such an award remains within the discretion of the court. *See*, *e.g. Ice Corp. v. Hamilton Sundstrand Corp.*, 615 F. Supp. 2d 1266, 1268 (D. Kan. 2009), *rev'd on other grounds,* 432 F. App'x 732 (10th Cir. 2011)("[I]t is within the Court's discretion to award exemplary damages not to exceed twice the amount of actual damages awarded on the KUTSA claim."  The Court looks to federal patent law for guidance in considering whether and to what extent exemplary damages are warranted.  The most recent articulation of that procedure is found in *Halo Electronics, Inc. v. Pulse Electronics, Inc.,* 136 S.Ct. 1923 (2016) in which the United States Supreme Court stated that

> Section 284 gives district courts the discretion to award enhanced damages against those guilty of patent infringement.  In applying this discretion, district courts are "to be guided by [the] sound legal principles" developed over nearly two centuries of application and interpretation of the Patent Act. *Martin*, 546 U.S., at 139, 126 S.Ct. 704 (internal quotation marks omitted). Those principles channel the exercise of discretion, limiting the award of enhanced damages to egregious cases of misconduct beyond typical infringement.

The United States Court of Appeals for the Federal Circuit clarified in *Presidio Components, Inc. v. American Technical Ceramics Corp.*, 875 F.3d 1369, 1382 (Fed.Cir. 2017) that

> Enhanced damages are generally only appropriate in egregious cases of misconduct, such as willful, wanton, or malicious behavior. *Halo*, 136 S.Ct. at 1932.  But an award of enhanced damages does not necessarily flow from a willfulness finding. *WBIP*, 829 F.3d at 1341, n. 13.  Discretion remains with the court to determine whether the conduct is sufficiently egregious to warrant enhanced damages. *WBIP*, 829 F.3d at 1341 n. 13.  In determining whether enhanced damages are appropriate, courts should consider the overall circumstances of the case. *Halo*, 136 S.Ct. at 1933.

23

After presiding over many years of pretrial development of the case and hearing the evidence during the three-week trial of this matter, the court determines that an award of $1,000,000.00 in exemplary damages is appropriate and is sufficient to meet the objectives for imposing such an award.

We reiterate the factors set forth in *Mattel, Inc.*, 801 F.Supp.2d at 954:

> To determine if, and to what extent, misconduct is reprehensible, courts must consider whether: (1) the misconduct caused physical harm; (2) the misconduct disregarded the health or safety of others; (3) the misconduct targeted a financially vulnerable party; (4) the misconduct was repeated; and (5) the harm resulted from intentional malice, trickery, or deceit, or mere accident. [*See State Farm Mut. Auto. Ins. Co. v. Campbell,* 538 U.S. 408, 419, 123 S.Ct. 1513, 155 L.Ed.2d 585  (The largest awards are reserved for the most reprehensible acts.)].  Because parties do not ordinarily expect that misdeeds that cause purely economic loss may expose them to severe exemplary penalties, economic misconduct is not generally reprehensible enough to support a large award of exemplary damages. *See Gore,* 517 U.S. at 577, 116 S.Ct. 1589. The exceptions, of course, are cases involving "affirmative acts of misconduct" marked not just by malice, but a breach of basic commercial ethics and fraud. *Id.* So entrenched is society's expectation that exemplary damages are proper in such cases that statutes, including the UTSA, routinely provide for the recovery of exemplary damages in cases involving financial loss and put the public on notice of the bounds of such relief.

First, we remain cognizant that this action is against Jarrow Formulas only and that the reprehensible conduct for which an award of exemplary damages must be attributable to it.

We find that certain evidence warrants the award of exemplary damages. Jarrow Formulas knew in March 2011 that Ashurst had been working on an activated formula broccoli seed extract product for over 3 years and that he was doing so under confidentiality agreements with Caudill Seed.  It pursued him anyway, offering to pay him to deliver on the activated formula for Jarrow Seed.  Both during and after Ashurst's employment with Caudill Seed, Jarrow Formulas requested and received confidential and proprietary Caudill Seed documents including a then-confidential provisional patent application, testing results, a "roadmap" of Caudill Seed's particular processes,

customer information including the particular ordering and blend ratio information for particular customers, vendor information, and a timeline for bringing an activated glucoraphanin broccoli seed extract product to market and thus "beating Caudill Seed to the punch."[5]

The evidence supports a conclusion that Jarrow Formulas deliberately and systematically courted Ashurst and directed him to provide the entirety of Caudill Seed's Trade Secret 1, its body of knowledge and know-how, its "seed-to-shelf" process, in order to obtain an unfair advantage in the market. It did so surreptitiously and with complete disregard for the injury it could not help but know that its misappropriation would cause. An exemplary damage award of $1,000,000.00 will educate Jarrow Formulas and others that such deceitful and unethical practices are beyond the bounds of legitimate industry competition.

There are, however, factors here which temper the decision to award exemplary damages and counsel an amount that falls appropriately on the continuum of awards. These factors are what this case does *not* involve. Jarrow Formulas' misconduct did not cause physical harm or endanger the health or safety of others. Caudill Seed is not a financially vulnerable party. Jarrow Formulas did not repeat the conduct, although the misconduct was bold and had significant ramifications not the least of which is the protracted and costly litigation in this Court. However, the Court is also awarding attorneys' fees to Caudill Seed. An award of both exemplary damages and attorneys' fees is permissible in cases of willful and malicious misappropriation under the KUTSA and we find in our discretion that both are appropriate in this case.

Exemplary damages in the sum of $1,000,000.00, approximately 41% of the damages awarded by the jury, is sufficient for purposes of addressing the reprehensible nature of the

---

[5] We refer to Caudill Seed's citations of the following evidence: PX 30, PX 35-38, PX 42, PX 43, PX 51, PX 52, PX 56, PX 57, PX 59, PX 67, PX 149, PX 150, PX 277; Trial Tr. Vol. 5, p. 171:7-10; Vol. 6-A, p. 45:9-21; Vol. 6B pp. 64:3-64:25; Vol. 8B, pp. 15:8-21, 33:5-7, 53:6-12, 66:4-19.

conduct. This determination is based upon the specific facts of this case. However, the court notes that a number of other courts have awarded exemplary damages in amounts 33% to 50% of the damage award in cases where the conduct, while reprehensible, was not wide-ranging, repeated, or involving injury or public health concerns. *See, Bimbo Bakeries, USA, Inc. v. Sycamore*, No. 2:13-cv-00749-DV-DBP, 2018 WL 1578115 (D.Utah March 29, 2018)(50% of damage award); *Storagecraft Technology Corp. v. Kirby*, No. 2:08-cv-00921, 2012 WL 4467519 (D.Utah Sept. 27, 2012)(50% of damage award); *Mattern & Assoc., L.L.C v. Seidel*, 678 F.Supp.2d 256 (D.Del. 2010)(33% of damage award).

Despite Jarrow Formulas' protestations that it has been "ruined" by this lawsuit and should not be further impaired by an exemplary damage award, we note the testimony of Clay Dubose that the $7.5 million in sales of BroccoMax over a 7-year period accounted for less than one-half of one percent of Jarrow Formulas' gross sales. DN 547, Vol. 12, p. 4, ln 18 – p. 5, ln 10. We thus find that the imposition of a $1,000,000.00 exemplary damage award and an award of attorneys' fees is substantial enough to address the gravity of the willful and malicious conduct but not excessive under the facts of record.

IV.     Prejudgment Interest

We will deny Caudill Seed's request for an award of prejudgment interest. First, we do not have liquidated damages here. Liquidated claims are "of such a nature that the amount is capable of ascertainment by mere computation, can be established with reasonable certainty, can be ascertained in accordance with fixed rules of evidence and known standards or value, or can be determined by reference to well-established market values." *State Farm Mutual Auto. Ins. Co. v. Norcold, Inc.*, 143 F.Supp.3d 586, 589 (E.D.Ky. 2015), citing *3D Enter. Contracting Corp. v.*

*Louisville and Jefferson Cty. Metro. Sewer Dist.*, 174 S.W.3d 440, 450 (Ky.2005) (citing *Nucor Corp. v. General Electric Co.*, 812 S.W.2d 136, 141 (Ky.1991)).  In determining if a claim is liquidated or unliquidated, the Court must look at the nature of the underlying claim, not the final award.  *Id.* The claim is liquidated if the amount of it is certain, even where [the defendant] may have a meritorious basis for denying payment or appealing. *Id.* citing *Bradley v. Louisville Commc'ns, L.L.C.*, Civil Action No. 3:05CV–734–H, 2006 WL 2620183, at *4 (W.D.Ky. Sept. 11, 2006).

> Examples include a "bill or note past due, an amount on an open account, or an unpaid fixed contract price." [*Nucor Corp. v. General Elec. Co.*, 812 S.W.2d at 141]. In contrast, an unliquidated damages claim is one which has "not been determined or calculated, ... not yet reduced to a certainty in respect to amount." *Id.* (citations omitted). An unliquidated claim is unspecified and undetermined prior to a breach.

*Heartland Materials, Inc. v. Warren Paving, Inc.*, 384 F. Supp. 3d 786, 798–99 (W.D. Ky. 2019).

However, the award of prejudgment interest in a case involving an unliquidated  sum is "left to the sound discretion of the trial court." *See Denzik v. Denzik*, No. 2004–CA–000944– MR, 2006 WL 3107110, at *2 (Ky.Ct.App. Nov. 3, 2006). In exercising its discretion, a court must base its decision "upon the foundation of equity and justice." *Church & Mullins Corp. v. Bethlehem Minerals Co.*, 887 S.W.2d 321, 325 (Ky. 1992).  Thus, while it has been said that "Kentucky courts 'rarely' impose such awards (*See Ky. Commercial Mobile Radio Serv. Emergency Telecomms. Bd. v. TracFone Wireless, Inc.*, 712 F.3d 905, 917 (6th Cir. 2013) ("Kentucky courts rarely award prejudgment interest on unliquidated claims on equitable grounds.")), the court also noted in *TracFone* that "allegations of bad faith are often involved" in those cases in which prejudgment interest *is* awarded. 712 F.3d at 917 (citation and internal quotation marks omitted).  "As the Supreme Court long ago explained, whether the harms are liquidated or unliquidated, 'the injured

party has suffered a loss which may be regarded as not fully compensated if he is confined to the amount found to be recoverable as of the time of [the harm] and nothing is added for the delay in obtaining the award of damages.' *Funkhouser*, 290 U.S. at 168, 54 S.Ct. 134. Thus most modern courts will permit prejudgment interest on unliquidated claims—even though, by definition, those claims were not 'ascertainable'" at the time of the harm—'when the period of time between the harm and the judgment is long or when there are other circumstances that would make it unjust not to give interest.'[citation omitted]." *Osborn v. Griffin*, 865 F.3d 417, 458 (6th Cir. 2017).

The court concludes, in its discretion, that an award of pre-judgment interest is inappropriate in this case despite the fact that the case has taken years to reach the entry of final judgment. We find that, as this is a discretionary award, we must do justice, and we find that Jarrow Formulas should not be forced to bear increased cost due to the passage of time.

In a pristine world, we might find such an award to be appropriate. However, Caudill Seed first chose to seek redress against Ashurst only, in the Jefferson County, Kentucky, Circuit Court. Apparently, the case ended badly for Caudill Seed and the claims against Ashurst were dismissed with prejudice. It was not until January 1, 2013 that Caudill Seed sought to pursue Jarrow Formulas for misappropriation and filed its complaint in this court. The filings in this case, now numbering almost 600, were borne, in significant part, from the nature of the plaintiff's claims in this case and the difficulties in defining their contours. As this is a trade secret case, there were substantial issues regarding the confidentiality of documents, the description of trade secrets, and the viability of claims, just to name a few topics thoroughly covered in pretrial motion practice.

Caudill Seed succeeded in attaining a verdict for willful and malicious misappropriation for which it is properly receiving compensatory damages, exemplary damages, and attorneys' fees.

28

The court declines to award prejudgment interest inasmuch as the sheer volume of information in this case made for a long period of development pretrial.

## V.    Attorneys' Fees

In its discretion, the court will also award Caudill Seed reasonable attorneys' fees.  Courts in the Sixth Circuit frequently do so where willful and malicious misappropriation has been found, under UTSA statutes. *See e.g. Kehoe Component Sales Inc. v. Best Lighting Products, Inc.*, N. 2:10CV-00789, 2014 WL 5034643 (S.D.Ohio Oct. 8, 2014), *vacated on other grounds,* 796 F.3d 576 (2015); *Tennsco Corp. v.* Carrington, No. 3:10-cv-0423, 2014 WL 6666120 (M.D.Tenn. Nov. 24, 2014).  Comment j to § 45 of the Restatement (Third) Unfair Competition provides that, "[i]n actions under the Uniform Trade Secrets Act, reasonable attorney's fees may be awarded if the appropriation is 'willful and malicious,' if the claim of appropriation is made in bad faith, or if a motion to terminate an injunction is made or resisted in bad faith. Id. § 4."  KUTSA provides for an award of attorneys' fees.  KRS 365.886.  This award may be made in addition to an award of exemplary damages, although the Court is not required to do so.

The reasonableness of an award of attorneys' fees is ordinarily determined under the 'lodestar' method, calculating "the product of reasonable hours times a reasonable rate."  *City of Burlington v. Dague*, 505 U.S. 557, 559, 112 S.Ct. 2638, 2640 (1992).

The court reviewed the original motion and declaration of Benjamin J. Lewis (DN 464-2) in support of Caudill Seed's request for an award of attorneys' fees in the total sum of $4,203,201.00 for work performed by three law firms.  Mr. Lewis' affidavit summarized that

> Caudill initiated this lawsuit on January 25, 2013. Jarrow heavily litigated this action for the six and a half years it took to get before a jury. Indeed, the docket reflects over 440 unique entries, many of which contain significant briefing and many pages of attachments. Caudill was forced to engage in: (i) pre-suit

negotiations with Jarrow regarding Jarrow's theft of Caudill's trade secrets; (ii) research of pertinent law and the underlying facts in dispute; (iii) exchanging over 100,000 pages of discovery; (iv) drafting and filing of myriad motions, responses, and replies; (v) review and responses to Jarrow's various court filings, including five motions for (or motions for leave or to reconsider) summary judgment; (vi) court appearances on many of these motions and at trial; (vii) preparation and participation in trial before a jury from June 3-26; (viii) filing or responding to ten motions in limine pretrial; and (ix) the instant Motion practice.

DN 464-2, p. 5. The Court has also reviewed the Supplement to the motion (DN 564), the billing records submitted by Caudill Seed (DN 565), and Jarrow Formulas' objections to the attorneys' fees which both generally and specifically objects to the billing records (DN 576).

We reject Jarrow Formulas' suggestion that we deny Caudill Seed any award of fees. We find, however, that insufficiencies in some of the billing records render it impossible for the Court to determine whether those billings are reasonable. We discuss those issues below and reduce the fees accordingly.

We note at the outset that Caudill Seed had the opportunity to address the specific challenges raised to the billing records in Jarrow Formulas' response. It chose not to do so. Rather, it responded in general terms, arguing that it is disingenuous for Jarrow Formulas to now complain that Caudill Seed's counsel's fees are too high when it looked to Caudill Seed's attorneys' fees in the Connecticut action as a benchmark for comparison with the higher fees of its former counsel. This argument does not address the specific deficiencies with which the Court was left to grapple in reviewing the 600+ pages of invoices produced by Caudill Seed.

A.

Caudill Seed was the "prevailing party" on its claim for willful and malicious misappropriation under KUTSA and thus cleared the first hurdle for an attorneys' fees award under KRS 365.886. The next determination is what fee is reasonable.

30

The starting point for this determination is a calculation of "the number of hours reasonably expended on the litigation multiplied by a reasonable hourly rate. "This calculation provides an objective basis on which to make an initial assessment of the value of a lawyer's services." *Hensley v. Eckerhart*, 461 U.S. 424, 433; 103 S.Ct. 1933, 1939; 76 L.Ed.2d 40 (1983).

> The party seeking an award of fees should submit evidence supporting the hours worked and rates claimed.  Where the documentation of hours is inadequate, the district court may reduce the award accordingly…The district court also should exclude from this initial fee calculation hours that were not "reasonably expended." S.Rep. No. 94–1011, p. 6 (1976). Cases may be overstaffed, and the skill and experience of lawyers vary widely. Counsel for the prevailing party should make a good faith effort to exclude from a fee request hours that are excessive, redundant, or otherwise unnecessary, just as a lawyer in private practice ethically is obligated to exclude such hours from his fee submission. "In the private sector, 'billing judgment' is an important component in fee setting. It is no less important here. Hours that are not properly billed to one's *client* also are not properly billed to one's *adversary* pursuant to statutory authority." *Copeland v. Marshall,* 205 U.S.App.D.C. 390, 401, 641 F.2d 880, 891 (1980) (en banc) (emphasis in original).

*Hensley*, 103 S.Ct. at 433-34.  Additionally, *Hensley* counsels the Court to consider the degree of success of the prevailing party in the case and disallow fees for work on unsuccessful claims unrelated "pursuit of the ultimate result achieved." *Id.* (internal citation omitted).  Fees for work on claims which "involve a common core of facts or will be based on related legal theories" are recoverable, keeping in mind the relationship of those claims to the litigation as a whole and the significance of the overall relief obtained. *Id* at 435. The court noted that where "excellent results" are obtained, a fee award should not be reduced simply because the plaintiff failed to prevail on every contention raised in the lawsuit. *Id.* The court further observed that

> A request for attorney's fees should not result in a second major litigation…The applicant should…maintain billing time records in a manner that will enable the reviewing court to identify distinct claims…Plaintiff's counsel, of course, is not required to record in great detail how each minute of his time was expended. But at least counsel should identify the general subject matter of his time expenditures…We reemphasize that the district court has discretion in determining the amount of a fee award. This is appropriate in view of the district court's superior

31

understanding of the litigation and the desirability of avoiding frequent appellate review of what essentially are factual matters. It remains important, however, for the district court to provide a concise but clear explanation of its reasons for the fee award.

*Id.* at 437 and n. 12.

### B.

Jarrow Formulas has challenged the hourly rates charged by the three firms which represented Caudill Seed at various points in this case. It contends that the rates have not been shown to be reasonable and commensurate with local rates.

Proof of rates charged in the community under similar circumstances and opinion evidence of reasonable rates may establish a reasonable hourly rate in the local community. "Additionally, a court may determine a reasonable rate based upon its own expertise and judgment." *L.M. by and through M.M. v. Henry County Bd. of Educ.* No. 3:18-CV-00037-GFVT, 2021 WL 236307, *5 (E.D.Ky. Jan. 21, 2021).

In his affidavit, Benjamin J. Lewis, a partner in the firm of Denton Bingham Greenbaum[6] and trial counsel in the case, described the depth and complexity of the case and the work required in litigating the case. He states that the case was heavily litigated for the six and a half years before trial. The docket reflects over 440 unique entries [603 entries as of this writing], many of which contain significant briefing and many pages of attachments. He notes that Caudill Seed: (a) engaged in pre-suit negotiations; (b) engaged in research of pertinent law and underlying facts; (c) exchanged over 100,000 pages of discovery; (d) drafted and filed numerous motions, responses, and replies; (e) made court appearances on motions and at trial; (f) prepared and participated in trial from June 3-26; (g) engaged in post-trial motion practice.

---

[6] Formerly Greenbaum Bingham Doll.

DN 464-2, p. 5, ¶ 14.

The affidavit does not offer other rates or case comparators, but this Court has such information at hand which satisfy us that the hourly rates billed for the timekeepers in this case are reasonable and commensurate with the rates charged by firms of comparable talent and experience in this district for work in this area of practice, and that the rates generally for the attorneys and staff at various levels fall within the hourly rate ranges for these firms. *Geier v. Sundquist*, 372 F.3d 784, 791 (6th Cir. 2004)("To arrive at a reasonable hourly rate, courts use as a guideline the prevailing market rate, defined as the rate that lawyers of comparable skill and experience can reasonably expect to command within the venue of the court of record."); *Clark v. West Iris Transport, Inc.*, No. 18-168-DLB-CJS, 2020 WL 2781601 (E.D.Ky. Feb. 27, 2020)("A reasonable fee is 'one that is adequately compensatory to attract competent counsel yet which avoids producing a windfall for lawyers." q*uoting, Kritcher v. Prudential Sec., Inc.* No. 19-1556, 2020 WL 548249, at *2 (6th Cir. Feb. 4, 2020)(quoting *Geier v. Sundquist, infra.*)).

First, we note that Jarrow Formulas hired local attorney Joel T. Beres, a partner of comparable skill and experience, in the firm of Stites & Harbison in Louisville, at a rate of $545 per hour to perform the post-trial work in this case[7].  Mr. Beres was a member of the defense team in the case and sat at counsel table throughout the trial.  Jarrow Formulas apparently has a shifting view about reasonable hourly rates for IP work in the Louisville legal community.

In the Connecticut action, Jarrow Formulas offered the expert opinion of Elisabeth Gray of the Louisville Firm of Middleton Reutlinger in support of Jarrow Formulas' claims of malpractice against its former counsel.  Among other opinions she rendered in the case, she opined that an

---

[7] There are other attorneys at Stites & Harbison also working on this case, but their hourly rates are unknown to the Court.

hourly rate of $520 per hour "is not a fee customarily charged in this locality for similar legal services." However, Sarah A. L. Merriam, United States Magistrate Judge for the District of Connecticut, stated that "Attorney Gray did not have complete information at the time she rendered her opinions, and the Court does not find her report, or her testimony, persuasive [that McCarter & English charged unreasonable fees and that it malpracticed the case]." Specifically, the Court noted that she "presumes that Attorney Gray was not informed, prior to preparing her report, that after it discharged M & E, Jarrow retained a local attorney, Joel Beres, at the rate of $545 per hour." Case No. 3:19-CV-00124-MPS, DN 124, p. 29.

At the upper end, the rates charged by partners in the firms representing Caudill Seed in this case do not apparently run afoul of Attorney Gray's opinion. No attorney billed in excess of $500/hour in this case, and the vast majority of the rates were substantially lower than the $500 per hour mark. But the question remains whether the hourly rates charged are reasonable for the work done in this forum in a case of this type and this magnitude. The United States Supreme Court noted in *Blum v. Stenson*, 465 U.S. 886 104 S.Ct. 1541, 79 L.Ed.2d 891 (1984) that "determining an appropriate 'market rate' for the services of a lawyer is inherently difficult. Market prices of commodities and most services are determined by supply and demand. In this traditional sense, there is no such thing as a prevailing market rate for the services of lawyers in a particular community. The type of services rendered by lawyers, as well as their experience, skill and reputation, varies extensively, even within a law firm. Accordingly, the hourly rates of lawyers in private practice also vary widely…Nevertheless, the critical inquiry in determining reasonableness is now generally recognized as the appropriate hourly rate. And the rates charged in private representations may afford relevant comparisons." *Id.* at n. 11.

More generally, billing rates for partners and paralegals in the top tier firms in this community was addressed in *Pogue v. Northwestern Mutual Life Ins. Co.*, No. 3:14-CV-598-CRS, 2017 WL 1520432 (W.D.Ky. April 24, 2017), a case cited by Jarrow Formulas.   Attorney Cornelius E. Coryell, a partner in the law firm of Wyatt, Tarrant & Combs, LLP, provided an affidavit in support of a request for attorneys' fees for his firm's work.   Attorney Coryell affirmed, in part, that in 2016, "The current billing rates for partners at Wyatt, Tarrant & Combs, LLP range from $260 to $575 per hour" and "The paralegal billing rate at Wyatt, Tarrant & Combs, LLP ranges from $110 to $230 [per hour]."   DN 105-1, pp. 1-2.   The particular hourly rates charged by Attorney Coryell or his paralegal in that case are of no moment, as the *Pogue* case involved insurance coverage issues, not IP practice such as in issue here.   We quote from the affidavit only to establish that in 2016, the high end of the range of billing rates for attorneys and paralegals at firms of similar caliber to those involved in this case far exceeds the rates charged in this case.

Finally, we refer to a trade secret misappropriation case that was tried to a jury in this court in 2018 for comparison of hourly rates charged in litigation in this particular area of practice.   The hourly rate charged in the case in 2016 by partner Pamela Moore was $425 per hour, by associates Kelly Gallagher,  and Tiffany Hubbard was $390 per hour and $345 per hour respectively, and paralegal Kimberly Wantak was $175 per hour.   *Babcock Power, Inc. v. Kapsalis,* Civil Action No. 3:13-CV-717-CRS, Aff. of Kelly Burns Gallagher, DN 242-7, pp. 1-2. [8]

This dovetails with the rates charged by the most senior partners in the firms of Denton Bingham Greenbaum ("DBG") and Frost Brown Todd ("FBT") who billed in this case in 2016 or 2017:  Patton Pelfrey at $465 per hour and Thomas O'Brien at $430 per hour at FBT in 2016 and

---

[8] These attorneys and paralegal were with the Connecticut firm of McCarter & English but were, presumably, requesting the court to award fees comparable to that charged by practitioners in this area is a similar case. This information is only helpful in a general sense since the billings referred to in the *Babcock Power* case do not reflect rates for trial work.

Mark Grundy at $425 per hour at DBG in 2017.  The hourly rate ranges for associates and paralegals is also comparable.  Thus, the Court is satisfied that the hourly billing rates presented in the request for attorneys' fees are reasonable, relying, in part, on the Court's knowledge in this area, as permitted by *Hensley*.  The Court's ruling in this regard is not a finding that rates charged by Caudill Seed's attorneys are the maximum reasonable rates for comparable counsel in IP practice in this community.  We find only that the rates charged by Caudill Seed's counsel are reasonable for work done in this case.

The Court concludes that Benjamin Lewis ' affidavit sufficiently articulates the need to for the level of expertise and experience demanded in this case.  Counsel for Caudill Seed were faced with formidable opponents from McCarter and English who displayed a commanding knowledge of the science governing the issues in this case.  Not only did counsel on both sides become facile with the scientific processes and knowledgeable about the industry, but they were required to teach a lay jury this information, a task that is exceptionally difficult in a trade secret case, but which was done very well for this jury.

We do not find merit in Jarrow Formulas' arguments concerning perceived disparities in the rates charged and increases in the rates of various associates and paralegals.  Nor are we persuaded by Jarrow Formulas' suggestion that lower rates should be utilized across the board for all timekeepers because the law firms did not provide their firm policies or reasoning for their rate structures and Jarrow Formulas is unable to parse the pedigrees of the timekeepers to its satisfaction.  Such information is not required. This is not an exact science and the Court is comfortable that the rates charged by the firms in this case are reasonable.

C.

Caudill Seed seeks $353,810.00 in addition to the $4,203,201.00 sought in its initial brief. Caudill Seed states that it incurred various additional legal costs in defending the secrecy of its information in this case in connection with the Connecticut litigation and in defending against Jarrow Formulas' motion for judgment as a matter of law.   The costs of defending the confidentiality of its trade secrets in connection with the Connecticut action are not recoverable under KUTSA as they were not fees incurred in achieving its successful result in the misappropriation action. Fees will be permitted for responding to  the JMOL motion as Caudill Seed was defending its successful outcome.  The Court will also award fees for time spent in identifying the appropriate redactions to the official transcript as the work was necessary to properly maintain certain testimony in the trial record as confidential.

Caudill Seed will be awarded $217,407.00 in attorneys' fees of the $353,810.00 requested in its Supplement (DN 564).

D.

The Court must next determine the reasonable hours billed for work in this case.  The Court finds that a number of Jarrow Formulas' challenges to the attorneys' fees requested are meritorious.  Caudill Seed chose not to respond in any substantive way to the challenges of double billing (O'Brien), duplicative billing (DBG getting up to speed in the case), missing invoices or bad math (FBT 2016, 2017, 2018), excessive billing (FBT summary judgment 2015), non-recoverable "overhead" (FBT 2014), and redactions and block billing (FBT primarily 2014, 2015). Therefore, the Court has cut the requested amount by a total of 28.6%  The Court's determination came down principally to the inadequacy of the billing records submitted by FBT.  Frost's 2014

37

timekeeping was so seriously and excessively redacted and, additionally, was block-billed in such a way that the Court was compelled to reduce the total for 2014 by 50%. This reduction constitutes approximately 46.3% of the total reduction in the fees requested. Additionally, there was a clear math error in the affidavit which inflated the FBT 2015 total for Thomas O'Brien at FBT by $175,835.00. Finally, an additional $132,138.00 was deducted for FBT 2017-2018 billing sheets which are completely missing. These three matters alone totaling $911,866.75 amount to 70% of the total attorneys' fees disallowed by the Court and are attributable solely to FBT billing records inadequacies. In addition to the reductions above, the Court has disallowed the fees sought by Pence & Ogburn for 2011 ($1,800) and 2013-2015 ($15,000) for work done solely in the state court action between Caudill Seed and Kean Ashurst. We reject Caudill Seed's contention that the state court action is "interwoven" with the claims in this case and were "based on the same nucleus of facts" so that the attorneys' fees would be recoverable in connection with the KUTSA verdicts. In fact, the state court action was singularly unhelpful to Caudill Seed in achieving its goals in this case. Due to the outcome in the state action, Caudill Seed was precluded from pursuing any claim against Kean Ashurst in this case. While the actions, generally speaking, involve the same subject matter, it appears to this Court that the action against Jarrow Formulas began anew in this Court with new theories of recovery and a different defendant in this action. Caudill Seed's litigation in the state court was of limited duration and its negotiations with Jarrow Formulas were wholly unsuccessful.

As explained in subsection E below, we have determined to follow Magistrate Judge Lindsay's rationale and deny Caudill Seed's motion for attorneys' fees and costs for its counsel's work on the Lanham Act claim. The Court finds $50,151.50 in 2016 FBT billings should be deducted for hours spent on the Lanham Act claim.

38

The FBT records for 2014 are both heavily redacted and block billed such that the Court cannot discern what work was done for numerous entries.  Entire pages are blacked out.  It is surprising that FBT would submit such a mess in support of a request that we award $1,207,787.50 in fees for 2014.  We will reduce the requested sum by 50% to $603,893.75.  *Kendall Holdings, Ltd. v. Eden Cryogenics, LLC*, No. 2:08-CV-390, 2014 WL 12652324, *14 (S.D.Ohio Mar. 4, 2014)(percentage reduction for redactions and block billing); *Herdguard, LLC v. NXT Generation Pet, Inc.*, No. 5:16-cv-468-JMH-EBA, 2019 WL 3082458 (E.D.Ky. Jul. 15, 2019); *Smith v. Service Master Corp.*, 592 F.App'x. 363, 371 (6th Cir. 2014)("so long as the description of the work performed is adequate, block billing can be sufficient.").

The Court also found two entries in the FBT 2014 billings totaling $866.50 for a runner and a .pdf converter which the Court categorizes as "purely overhead" and non-compensable.  *EEOC v. Dolgencorp, LLC*, No. 3:14-CV-441, 2017 WL 9517513 (E.D.Tenn. Aug. 7, 2017)(reduced hours for purely clerical work).  The Court rejects Jarrow Formulas' challenge to additional entries on this ground.

The inaccuracies verified by the Court in the FBT 2016 billings for either math computation errors or missing time sheets total $173,086.00.  The deduction for FBT 2017-2018 missing time sheets totaled $132,138.00.  Additionally, the Court deducted for 6 specific excessively redacted entries in 2015 which totaled $2,716.00.  *Kendall, supra.; Herdguard, LLC, supra.*

The double billing for O'Brien (FBT 2015) required a deduction of $175,835.00.  The Court also deducted $1,931.25 for "duplicative billing" for Benjamin Lewis (DBG 4/3/17), Jared Cox (DBG 4/11/17), Mark Grundy (DBG 4/11/17) and Benjamin Lewis (DBG 4/11/17 50% reduction) for time billed in getting up to speed in the case when DBG took over from FBT.

*Kendall Holdings, supra*. at *14 (duplication of fees in pass-off of case); *Smith*, *supra.* at 372 (in complicated cases with many lawyers, employ arbitrary but essentially fair approach of simply deducting percentage).

Jarrow Formulas complains of excessive billing as well, offering the concrete example of the large number of FBT timekeepers and hours billed for work on the summary judgment briefs in 2015.  The Court is aware from having addressed the motions that there were numerous issues addressed on summary judgment.  The summary judgment phase of the case was a massive undertaking and a great deal of time was necessarily expended .  The Court has gleaned from the 2015 FBT records that for two weeks in January, from 1/2/15 to 1/16/15, FBT billed $59,177.50 for work related to the summary judgment.  Concerned by this large sum, we felt compelled to dig deeper into the situation.

The principal author appears to have been a senior associate with the firm,  Thomas C. Gleason, who billed 94.6 hours at $245 per hour for a total of $23,187.00 over a two-week period. Such is the life of an associate in this role in complex litigation.  The Court finds his time entries reasonable. There were other contributors less prominent on the project who collectively billed $19,757.50.  These billing will be allowed, as a brief of the size and significance of the one in issue no doubt required many hours of associate-level work and paralegal support. What appears to have been excessive was the partner reviews of the work which was billed at rates from $375 – 450 per hour for 1/3 the number of hours of the principal drafter  -  Thomas O'Brien: 17.7 hours at $415 per hour; Cory Skolnick: 16.5 hours at $375 per hour; Patton Pelfrey: 3.5 hours at $450 per hour, for a total of 37.5 hours of partner level review resulting in $15,108.00 in fees over a two week period.  Despite the importance of the work at this phase of the litigation, the Court will disallow a portion of this senior level review.  First, the Court will deduct $415.00 for Thomas

O'Brien's 1-hour review of the *already filed* brief performed on 1/16/15. The Court will then award 50% of the remaining total in the sum of $7,346.50. *Kendall, supra.; Smith, supra.* We reject Jarrow Formulas' more general challenges of excessive billing as unverifiable.

Finally, we reject Jarrow Formulas' argument that the fees should be reduced because Caudill Seed did not achieve substantial success in the case. That argument is ludicrous. The jury found that (1) Caudill Seed had proven that it possessed a trade secret in 5 of the 6 trade secrets identified in the case, (2) Jarrow Formulas misappropriated Caudill Seed's Trade Secrets 1, 3, 4, and 5, (3) Jarrow Formulas willfully and maliciously misappropriated Trade Secret 1, and (4) Caudill Seed was awarded over $2,000,000 in damages for the misappropriation of Trade Secret 1. We find that time spent with respect to all of these trade secret claims contributed to the overall success Caudill Seed had in the case. We reiterate that where "excellent results" are obtained, a fee award should not be reduced simply because the plaintiff failed to prevail on every contention raised in the lawsuit. *Hensley, supra.*

In summary, the calculation of the reasonable attorneys' fees in this matter is as follows:

| | | | |
|---|---|---|---|
| Total Fees Sought: (DN 464) | $4,203,201.00 | | |
| | -$1,800.00 | Pence & Ogburn 2011 | state case |
| | -$15,000.00 | Pence & Ogburn 2013-15 | state case |
| | -$603,893.75 | FBT 2014 | block billing heavy redactions |
| | -$1,931.25 | DBG 2017 | dupl. billings (hand-off) |
| | -$175,835.00 | FBT 2015 | double billing (math error -O'Brien) |
| | -$866.50 | FBT 2014 | "overhead" |

| | -$173,086.00 | FBT 2016 | math errors missing time sheets |
| | -$50,151.50 | FBT 2016 | Lanham Act CC |
| | -$132,138.00 | FBT 2017-2018 | missing time sheets |
| | -$11,602.50 | FBT 2015 | excessive billing (SJ) Heavy redactions (6 entries) |

Reasonable Attorneys' Fees:   $3,036,896.50
(DN 464)

Total Fees Sought:   $353,810.00
(DN 564 Supplement)

-$136,403   DBG 2019-2020   Connecticut Action

Reasonable Attorneys' Fees:   $217,407.00
(DN 564)

**TOTAL ATTORNEYS'**
**FEES AWARD:**   **$3,254,303.50**

Based on the foregoing, the Court finds under the lodestar analysis that an award of $3,254,303.50, the product of a reasonable number of hours times a reasonable rate, constitutes reasonable attorneys' fees which will be awarded under KUTSA in this case.

## E.

Caudill Seed has renewed its motion for a fee award on "exceptional case" grounds in light of the dismissal of Jarrow Formulas' Lanham Act counterclaim.  In the context of the outcome of the case as a whole and the awards made, the court, in its discretion, will deny the motion (DN 161). In so doing, we have considered the rationale set forth in the opinion of United States

Magistrate Judge on this point (DN 178).[9]  We particularly note, as did the Magistrate Judge, that Caudill Seed has not shown that the relative weakness of Jarrow's Lanham Act counterclaim stands out from other cases. Jarrow made clear in its memorandum in support of the motion to amend that it based its Lanham Act counterclaim on the Supreme Court's holding in *Lexmark*. Def.'s Mem. Supp. Mot. Am. 7 (DN 66)(citing *Lexmark Int'l, Inc. v. Static Control Components, Inc*., 134 S.Ct. 1377 (2014)). Jarrow also cited the deposition of Dan Caudill in support of its contention that Caudill Seed was irradiating Broccoraphanin in violation of FDA regulations. Def.'s Mem. Supp. Mot. Am. 4. Jarrow's pursuit of a new counterclaim, purportedly on the basis of recent Supreme Court precedent and newly discovered evidence, does not make the relative strength of its litigation position stand out compared to other cases. Although Judge Heyburn expressed misgivings over whether Jarrow should proceed with the Lanham Act counterclaim, those misgivings do not establish that Jarrow's counterclaim stands out from other cases with respect to the relative weakness of Jarrow's counterclaim. We indicated the amount to be deducted from the attorneys' fees sought to account for this ruling.

Motions having been made and for the reasons set forth in this Memorandum Opinion and the Court being otherwise sufficiently advised, **IT IS HEREBY ORDERED AND ADJUDGED** that:

1. The motion of Defendant Jarrow Formulas, Inc. for the Court to take judicial notice (DN 577) is **DENIED**.

2. The motion of Defendant Jarrow Formulas, Inc. for leave to file a sur-reply to Caudill's reply to its request for an award of attorneys' fees (DN 585) is **GRANTED**.

---

[9] This Court vacated the  Magistrate Judge's Order denying the award attorneys' fee and costs as beyond the authority authorized by 28 U.S.C. § 636(b)(1)(A) and stayed the motion until the merits of the case were decided.  (DN 205). Despite our Order vacating it, the Magistrate Judge's Order contained a thoughtful analysis and reasoning with which the Court agrees and which is adopted, in part, as our own herein.

3. The motion of Plaintiff Caudill Seed and Warehouse Company, Inc. for sanctions (DN 587) is **DENIED**.

4. The motion of Plaintiff Caudill Seed and Warehouse Company, Inc. for an award of attorneys' fees for the successful defense of Jarrow Formulas' Lanham Act counterclaim (DN 161) is **DENIED**.

5. The motion of Plaintiff Caudill Seed and Warehouse Company, Inc. for an award of exemplary damages, prejudgment interest, attorneys' fees and for entry of final judgment (DN 464) is **GRANTED IN PART AND DENIED IN PART** as follows:

   a. The motion is **GRANTED** as to exemplary damages, attorneys' fees, and entry of final judgment.

   b. The motion is **DENIED** as to prejudgment interest and attorneys' fees for Lanham Act "exceptional case."

6. Plaintiff Caudill Seed and Warehouse Company, Inc.'s supplement in support of its request for an award of attorneys' fees is **GRANTED IN PART AND DENIED IN PART** as set forth herein.

7. DNs 522, 523, and 524 having been vacated by our previous Order (DN 532), they shall be **STRICKEN FROM THE RECORD.**

A separate Final Judgment will be entered herewith in accordance with this Memorandum Opinion and Order.

**IT IS SO ORDERED.**